John William SHAPARD, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–14017.

Court of Criminal Appeals of Oklahoma.

Nov. 20, 1967.

Rehearing Denied March 4, 1968.
Second Rehearing Denied March 15, 1968.

Shapard & Shapard, Oklahoma City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Penn Lerblance, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

John William Shapard, hereinafter referred to as the defendant, was convicted for the crime of Rape in the Second Degree in the District Court of Canadian County, sentenced to serve five years imprisonment, and appeals.

In his brief, defendant argues numerous assignments of error under seven separate propositions. For the purpose of clarity, we will deal with each of these assignments of error as they arose in the pre-trial proceedings and during the trial, without regard to the propositions under which they were urged in the defendant's brief.

The defendant, age 16, was charged in the Justice of the Peace Court of Marvin Cavnar in Oklahoma County, Oklahoma, with his co-defendants, Larry Wyatt Smith, age 17, Richard Payton Stanley, age 17, Michael Otis Stanley, age 17, James David Fellers, Jr., age 17, Johnny Ishmael, age 16, and Paul Hampton Brogan, age 17, for the crime of Rape in the Second Degree, allegedly committed on the 7th day of July, 1965, upon a 15 year old girl. A preliminary

hearing was commenced on the 7th day of September, 1965, and terminated on the 9th day of September, 1965, at which time the defendant and his co-defendants were bound over to the District Court of Oklahoma County, where their arraignment was set for September 17, 1965.

As one of his propositions, defendant urges that he was denied a proper preliminary hearing as required by law by reason of the following errors:

A. That the examining magistrate refused to call and examine the witnesses present and subpoenaed by the defendant and therefore the information upon which he was tried and all subsequent proceedings were void ab initio;

B. That the refusal of the examining magistrate to call and examine witnesses present and subpoenaed by defendant constitutes a denial of constitutional right of due process under the Sixth Amendment made obligatory on the States by the Fourteenth Amendment.

In support of "A" listed above, the defendant further states in his brief:

"In the purported preliminary hearing, the Defendant was denied his statutory, fundamental and constitutional rights under the Constitution and laws of the State of Oklahoma and the Constitution of the United States of America and was denied due process in that the Examining Magistrate refused to allow Defendant to call witnesses subpoenaed for the defense and present at the purported preliminary hearing, which would have proved the defendant innocent and that no crime had been committed.

The Examining Magistrate refused to allow Defendant to call medical witnesses to the stand to prove the physical condition of the prosecuting witness immediately after the alleged crime and which would have proved that no rape was committed.

The Examining Magistrate refused to allow medical technicians and custodians of records in hospitals and laboratories to testify and produce records, showing the results of examinations and laboratory studies conducted by them immediately after the commission of the alleged crime with which Defendant was charged and which would have shown Defendant innocent.

The Defendant issued subpoenas for the following twenty-two (22) witnesses who were present and ready to testify: Johnny Ishmael, Martha Noble, Billy Noble, Patricia Laverty, [the prosecutrix], Sandra Kay Laverty, Dr. Harry Deupree, J. W. Athony, G. P. Tucker, M. B. Cooper, Dr. Joe Reynolds, Larry Uandell, Dr. Rex Kenyon, John Dudley, E. D. Hill, Mary Marshall, Jim Reeding, Dr. William K. Ishmael, Bruce Knox, Robert Singletary, John Rowden and Kelly Jones.

The following (10) witnesses were endorsed upon the Preliminary Information as Witnesses for the State and were present: Patricia Laverty, [the prosecutrix], Sandra Kay Laverty, Dr. Harry Deupree, J. W. Anthony, G. P. Tucker, Lt. Jim Reeding, M. B. Cooper, Dr. Joe Reynolds, Johnny Ishmael.

The testimony in this Preliminary Hearing was terminated after only four (4) witnesses had testified for the State. Johnny Ishmael and [the prosecutrix] testified with reference to the alleged crime and J. W. Anthony, Police-man and M. B. Cooper, County Attorney's Chief Investigator, testified solely as to the location of the alleged crime.

The defendant was permitted to call only two witnesses of the ten witnesses endorsed on the Preliminary Information. Sandra Kay Laverty testified and upon the calling of the second witness, Dr. Harry Deupree who would have shown no crime was committed, the court refused to permit him to testify * * *."

Defendant relies upon Article 2, Oklahoma Constitution, Section 17, the same providing:

"No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment or by information. No per-

son shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination. Prosecutions may be instituted in courts not of record upon a duly verified complaint."

Defendant urges that the language used in Wyatt v. State, 69 Okl.Cr. 93, 100 P.2d 283, is particularly applicable in the instant case wherein this Court stated:

"The district court did not have jurisdiction to try the defendant unless the defendant had actually had a preliminary examination or waived the same."

Defendant further relies upon 22 O.S. § 257, which is as follows:

"At the examination the magistrate must, in the first place, read to the defendant the complaint on file before him. He must, also, after the commencement of the prosecution, issue subpoenas for any witnesses required by the prosecutor or the defendant."

as well as 22 O.S. § 259, which is as follows:

"When the examination of the witness on the part of the State is closed, any witnesses the defendant may produce must be sworn and examined."

Defendant then cites Parmenter v. State, Okl.Cr.App., 377 P.2d 842:

"At the hearing, all witnesses whose evidence is material and relevant upon these issues should be heard."

He urges that the language used in Wyatt v. State, supra, and Parmenter v. State, supra, are controlling in the instant case.

In answer to Proposition "A" under this assignment of error, the State's position is that the defendant had a proper preliminary examination as required by law and that he was not prejudiced or denied any fundamental right when all defendant's witnesses were not heard at the preliminary examination. In support of this conclusion, the State relies upon Melchor v. State, Okl.Cr.App., 404 P.2d 63, in which this Court quoted from 22 C.J. S. Criminal Law § 331, in defining a preliminary examination:

"Its purpose is to determine whether an offense was committed and whether there was probable cause to believe that the accused was guilty thereof."

In this regard the State relies upon the following language which appears in Melchor v. State, supra, as well as Parmenter v. State, supra (relied upon by defendant above):

"A preliminary hearing is not a trial, since it is not conducted to determine the guilt of accused, but only the two issues— was a crime committed, and is there probable cause to believe the accused committed it."

In 22 C.J.S. Criminal Law § 340, in discussing the duty of the examining magistrate at the preliminary examination it is stated:

"A statute, however, which provides that he shall examine complainant and the witnesses on oath is directory as to the quantity of the evidence to be taken, and does not require him to examine all the witnesses for the state if he is satisfied with less * * *." People v. Curtis, 95 Mich. 212, 54 N.W. 767.

And further, 21 Am.Jur.2d, Criminal Law, § 449, provides:

"Its only obligation is to produce enough proof to give probable cause for believing the accused guilty of the crime charged. An indictment or information will not therefore be quashed on the ground that at the preliminary examination the defendant was committed without the examinations of all the witnesses who were summoned for the State or who were subsequently used at the trial."

The State further quotes from Melchor v. State, supra, in which the following appears:

"Defendant further complains because the county attorney did not call all of the witnesses listed at the preliminary hearing, and that defendant should have been entitled to cross-examine all of these witnesses as a matter of right. However, he does not support this with any cited

authority; nor do we find it to be the law in this State."

and further:

"Certainly, the evidence at the preliminary hearing was sufficient to believe a crime had been committed, and probable cause to believe that the defendant herein had committed it.

As we stated, defendant did not allege any defense—either at the preliminary hearing, or at the district court trial. There is no reason to believe that the jury's verdict would have been any different had all of the witnesses testified at the preliminary hearing. It had no bearing on the evidence submitted to the jury."

■ We are of the opinion that the evidence adduced at the preliminary hearing was ample to support the magistrate's finding that a crime had been committed and his finding that there was probable cause to believe that the defendant was guilty. We are of the further opinion that the failure of the magistrate to hear the testimony of the witnesses which the defendant sought to call was in no way prejudicial to the accused who was provided, prior to trial, a report of the medical examination conducted on the prosecutrix shortly after the alleged rape occurred.

■ It is significant that the defendant did not attempt to call any of the witnesses on the trial whose testimony he now urges was vital to his defense at the preliminary hearing. It is thus clear that the defendant did not consider the testimony of these witnesses material to his defense and we are of the opinion and therefore hold, that where evidence presented at preliminary hearing before a magistrate is sufficient to establish that a crime has been committed and there is probable cause to believe the defendant guilty, the failure of the magistrate to allow the defendant to offer testimony of witnesses whose testimony is not material to the defense, does not constitute reversible error. The question of the materiality of the testimony sought to be produced at preliminary hearing must be determined from an examination of the entire record.

■ The defendant, under Proposition "B", asserts:

"That the refusal of the examining magistrate to call and examine witnesses present and subpoenaed by defendant constitutes a denial of constitutional right of due process under the sixth amendment made obligatory on the states by the fourteenth amendment."

No authority is cited to support this contention and we are of the opinion that the same is wholly without merit.

It is further urged that:

"The defendant was denied a fair and impartial trial consistent with due process of law as guaranteed and required by the Constitution by reason of the fact that the judiciary overstepped the bounds of judicial propriety and acted with undue haste and with partiality."

Under this assignment of error defendant urges that the remarks of Judge Cavnar occurring at preliminary hearing, were so fundamentally prejudicial as to require reversal. The remarks complained of appear in the transcript as follows:

"Before I rule on these other boys, I have the urge to make some statements.

Probably, a little philosophy is involved in matters like this. You know, we have laws of God and we have laws of Nature; we have the laws of Pennsylvania and New York and Illinois and Oklahoma, as well as our federal laws. These laws are all made to be obeyed; all of them.

If you don't know, all the laws are based upon right and wrong. You can check the law, pro and con, on most any matter, civil or criminal, and you'll find that they are fair.

They have been meted out by lawyers and judges from time immemorial. There has been a lot of study made on them.

I think that we have got a situation here in Oklahoma City, and in Oklahoma

County, probably in the entire state, that needs to be looked into.

This old song, you have heard it, 'Love makes the world go round,' I think it's a pretty true song.

There are many ways to demonstrate love. Love of father, love of mother, love of brother, love of sister, love of the Flag, love of our country, love of everything.

Love makes the world go round; it really does. If love didn't make this world go round, the Almighty, I think, would stop it and burn it up.

Now, I believe that we have to back up and take a look at things. I heard my old father say one time, he said, 'You know, if my foresight was just about one-tenth as good as my hindsight, I'd be rich.'

The same is true of other things. It's time for us to take stock. It's time for parents everywhere to know where their children are. It's time to do that.

Maybe we need a curfew here in town. I understand that we have one; I don't know whether it is ever enforced or not. I haven't checked it lately. I don't know whether we have a curfew or not.

But, if we don't have, we should have one, and I think that applies to grown people as well as kids.

I think it's incumbent upon every parent, under the sound of my voice, to know where their children are at all times, to see that they obey.

I think if that happens, you can control your children, that you will not have any trouble with them.

I raised two boys; maybe I'd better knock on wood. They have never been in any serious trouble.

But, that doesn't mean that it couldn't happen to anybody at any time.

Here, we have a bunch of fine men whose children have gone astray just a little bit; some of the finest men in town, and it's a shame.

I had the urge to just make these few remarks, and to have fathers and mothers to take stock of themselves and their family life, and see how much love there is in that family.

If you'll pardon a personal remark, my youngest son is 29 years old, and do you know I've been sitting down reading the paper, watching television or something, and if he took a notion, he would come over and stoop down and kiss me on the jaw, and tell me that he loved me.

And, do you know something else, I like it; I like that.

And, he's got more whiskers on his face than I have, but I have kissed his face a time or two and told him that I loved him.

And, it doesn't hurt a father to kiss a 16-year-old boy or a 17-year-old boy and tell him that you love him. You can't just tell him that you love him by giving him a car and a place to go. You've got to tell him, actually, that you love him. Let them know that they belong.

Do you see what I mean?

Now, these are just a few of the things that are necessary to make up this life that we live.

There is many, many ways that a child can have a good time without him going out and violating the law.

You kids that are here and under the sound of my voice, I want you to take heed of what I am telling you about this.

I have so many cases like this up in my court. For instance, a child abandonment case that the County Attorney files in my court, or vagrancy for non-support of a child or children, and I never—the lawyers will tell you who practice in my court up there, that I always ask these wayward fathers, 'Do you love this child? Do you love these children? Well, if you say you do, why aren't you supporting them? Don't you know that they are entitled to a glass of milk before you even get a drink of water? These children are innocent.' Those are the things we are fighting for. These kids ought to know that we are fighting for them; we're trying to do things for them.

Sometimes we have to get pretty rough with the father that thinks that he is more important than his children, or than his family. We don't like that.

Now, we're not up there in this little old court of mine to persecute people. We're there to prosecute, if need be, and that's all.

I know that we do a lot of good up there; we put a lot of people in jail, we have to.
\* \* \*."

Defendant contends that these remarks were published in the paper where prospective jurors probably read them and they were prejudiced thereby.

■ The remarks of the Magistrate at the preliminary hearing were undoubtedly made by Judge Cavnar in good faith and with a view of advising the defendants and their parents of his philosophy relating to the parent-child relationship and their duty toward each other and society, but they were improper as a part of the preliminary hearing and should not have been made. These remarks, however, were not made before the jury who tried the case in El Reno after the first change of venue was granted, and there is nothing in the record of the voir dire examination of the jurors to indicate that the magistrate's remarks were ever read by any of them or that they had formed an opinion of the defendant's guilt based upon said remarks. To the contrary, as we will later point out, we are of the opinion that the jurors who tried the defendant were fair and impartial and that their verdict was not based on pre-trial publicity.

Although the arraignment was set for September 17, 1965, on that date said arraignment was continued to the 20th day of September, 1965, and the defendants thereafter filed a Plea in Abatement and Motion to Quash and Set Aside the Information. A hearing on these pleadings and defendant's arraignment were set down for October 1, 1965, before JoAnn McInnis, District Judge, Division No. 6, Oklahoma County, Oklahoma. Judge Clarence Mills also sat in an advisory capacity. Said Motions were overruled, whereupon the defendants stood mute and the court entered a plea of "Not Guilty."

Thereafter, Shapard, et al, sought an order of this Court prohibiting the District Court of Oklahoma from further proceedings on the ground that the defendants had been denied a proper preliminary hearing and that the District Court was without jurisdiction. On the 2nd day of November, 1965, this Court denied the writ prayed for holding that the question raised was reviewable only on appeal. Thereafter trial was set.

Thereupon, the defendant filed a Motion for Continuance and a Motion for Change of Venue, which was heard on the 4th day of November, 1965, before Judge Boston Smith, presiding Criminal Division Judge of Oklahoma County. At the conclusion of said hearing, the following appears in the record at Page 75 of the Transcript of Proceedings November 4, 1965:

"THE COURT: The Court is going to grant Change of Venue.

Like Mr. Duncan says and I respect his opinion, I have seen him try cases before juries here for years and he says, 'Why take a chance.' I think that Oklahoma City wants these defendants to have a fair trial and it is our sworn duty to give them a fair trial and the mention of the word 'rape' stirs emotion. We know that, particularly in the minds of women, mothers, but the record is replete here, I have just been going through this exhibit here while counsel was making their argument.

Their affidavits from responsible citizens who all bear good reputations in the community. It is pretty hard to disregard these affidavits.

MR. MOORE: If the Court will notice that those are the form affidavits.

THE COURT: I understand that. But, we want them to have a fair trial. Let's give them a fair trial.

Now the State has some rights here too. We sometimes forget that the State of Oklahoma is the plaintiff and that is the

people of Oklahoma or State of Oklahoma and the defendant in so many of these cases demand a speedy trial. The constitution says that he is entitled to a speedy trial and the public is entitled to have these trials—these cases tried just as fast.

The offenses occurred in July, the alleged offenses, that is what the Information says. And, here it is November, of course, October and November were the first two months we could have tried it, isn't that right?

MR. HARRIS: Yes sir.

THE COURT: Now I am going to check on the availability of the Courtroom in El Reno and a Jury. We are going to try this case this month if at all possible.

And so we are just going to move over to El Reno and start this case.

Now, I am going to check right now the availability of the Courtroom and a jury panel and I will ask counsel to stand by. It will take a few minutes while I call over there.

MR. SPIVEY: If the Court please, is the Court granting now the Change of Venue?

THE COURT: Yes, sir.

(THEREUPON, the Court recessed at 4:00 o'clock P.M.)."

As assignment of error defendant asserts (quoting from page 119 of his brief):

"On the 4th day of November, Judge Smith had listened to convincing testimony in support of the Change of Venue and almost in what appeared to be anger because the trial of the Defendant might be delayed, with his voice reaching the point of shouting, stated:

'The State has rights too * * * The public is entitled to have this trial * * * we are going to try this case this month * * * We are going to move over to El Reno and start this case' (C-M., Transcript of Proceedings Nov. 4, 1965, page 76.)"

■ When taken out of context the remarks quoted in the brief and the description of the tone of voice in which they were made, tend to support the defendant's contention; however, even the most cursory reading of Judge Smith's remarks discloses a desire and intention to protect the rights of the defendants in securing them a fair trial. His statement that defendants and the public are entitled to a speedy trial as guaranteed by the Constitution is a correct statement of law and there is nothing to support the defendant's contention that his conduct or ruling showed partiality for the State and against the accused. Moreover, we are of the opinion that it does not demonstrate that Judge Smith acted with undue haste and thus sped the defendant to trial. We will again deal with this issue as it appears in the record.

At said hearing of November 4, 1965, an Order for a Change of Venue was issued by Judge Smith and the case was removed from Oklahoma County to Canadian County, in the City of El Reno, Oklahoma, for trial.

On the 10th day of November, 1965, the defendant filed an application for a Change of Venue from Canadian County and a Motion for Continuance; on the 12th day of November, 1965, he filed an application to take out-of-state depositions. A hearing was conducted on the 12th day of November, 1965 on defendant's Motion for Change of Venue and Continuance and the same were denied by the trial court.

Defendant now asserts that the trial court's ruling denying him a change of venue and a continuance constitutes reversible error. The defendant argued in support of these motions in the trial court, and here on appeal, that he could not obtain a fair trial in Canadian County by reason of adverse pre-trial publicity.

■ The evidence adduced and attempted to be introduced on behalf of defendant on the application for Change of Venue was in sharp conflict with that offered by the State, save and except the newspaper articles, letters and exhibits,

which the defendant introduced. Based on the evidence presented to him on this motion, we are of the opinion that the trial court did not err in refusing to grant the change of venue; however, this ruling is not determinative of the issue of whether the jury selected was biased and prejudiced against the accused. We are of the opinion that the trial court did not err in overruling defendant's Motion for Continuance based upon the identical evidence offered in support of the Motion for Change of Venue. We here adopt the language used in United States v. Hoffa, D.C., 156 F.Supp. 495:

"Mere fact that there has been widespread adverse pretrial publicity about defendant does not, by itself, establish reasonable probability that defendant cannot obtain a fair and impartial jury at criminal trial and is therefore entitled to postponement of trial for indefinite or substantial period of time.

Mere fact that prospective jurors have read newspaper or other publicity items critical of defendant does not, by itself, establish bias, pre-judgment, or other disqualification on part of prospective jurors, and does not entitle defendant to postponement of trial for indefinite or substantial period of time.

Where there has been widespread adverse pretrial publicity about defendant, proper procedure in vast majority of cases is not to postpone trial indefinitely or for substantial period of time, but to proceed to trial and to determine on voir dire of panel and individual talesmen whether fair and impartial jury can be selected."

We will later consider the competent evidence preserved in the record in Volume I of the Case-made insofar as it relates to the issue of whether the defendant was able to secure a fair trial in Canadian County.

On the 16th day of November, 1965, the Motion to Take Out-of-State Depositions of witnesses was granted. On this same date, the parties, after having announced ready for trial, began selecting the jurors on voir dire, and on this same day defendant filed a Motion to Quash the jury panel. It

is now urged that the trial court erred in overruling this Motion to Quash the jury panel on a number of grounds, but argues specifically that the court violated Rule 22 of the 7th Judicial District. This rule is set forth in defendant's brief as follows:

" 'When a jury should be called, the presiding judge shall specify in a written order to the court clerk, the number of jurors needed. * * * The order shall be made and drawing had at a time *not less than twelve days* or more than twenty next prior to the date on which said jurors shall be ordered to report for duty.' (Emphasis supplied.)"

Although the defendant alleges that the Motion to Quash was called to the attention of the court, we have carefully examined the record and are unable to find anything which would support this contention. This motion was filed on the day that jury selection began and had defendant wished to urge the motion he should have called it to the attention of the court prior to the selection of the jury and requested a hearing thereon, presented evidence and argument, and excepted to the ruling of the court.

Title 38 O.S. § 29 provides in part:

" * * * A substantial compliance with the provisions of this Chapter [the calling of juries], shall be sufficient to prevent the setting aside of any verdict rendered by a jury chosen hereunder, unless the irregularity in drawing, and summoning or empaneling the same, resulted in depriving a party litigant of some substantial right; provided, however, that such irregularity must be *specifically presented to the court* at or before the time the jury is sworn to try the cause." (Emphasis supplied.)

The failure of the defendant in the instant case to specifically present this motion to the court prior to the selection of the jury constituted a waiver or abandonment of the same and cannot be considered on appeal.

Defendant's argument, appearing at page 120 in his brief, that the trial court's ruling,

when none had been made, demonstrated bias and prejudice toward the accused, under the circumstances here presented is completely without merit.

Prior to this time, a severance was granted to several defendants and the State elected to try John William Shapard first.

This leads us to a consideration of one of the crucial issues in this appeal, viz., was the jury selected in Canadian County so biased and prejudiced against the accused by the pre-trial publicity that he was unable to secure a fair trial in Canadian County? In considering this issue we deem it necessary to set forth in considerable detail the voir dire examination of prospective jurors as they appear in Volume I of the Case-made.

The jury selection commenced on November 16, 1965, with the voir dire examination of the prospective jurors being examined by the County Attorney, who challenged six of the first 18 jurors for cause and passed the remaining 12 for cause, at approximately 12:30. Thereafter, at 2:00 p. m., the voir dire examination resumed with Mr. Bill Berry, one of the defense counsel, examining the remaining 12 jurors extensively as to their qualifications to sit as jurors, whether or not they were familiar with the pre-trial publicity, and their opinion or impression based thereon. This examination continued until a 15 minute recess was declared by the court. After the recess, counsel for defense resumed the questioning of the prospective jurors until 5:15 in the afternoon, at which time the court recessed the proceedings and properly admonished the jury panel not to discuss, listen to, or read anything concerning the case during the recess. He further instructed the jury to return the following morning.

On the morning of November 17, 1965, Mr. Berry called the court's attention to an article which appeared the previous evening in the *Oklahoma City Times*. The gist of the article purported to quote the County Attorney as stating that two of the co-defendants intended to enter a plea of guilty. The State then called the court's attention to an article in the morning paper which purported to reflect on the immorality of the prosecutrix. The defendant then moved for a mistrial and the same was overruled.

The voir dire examination was then resumed by counsel for defense, who completed his examination of the 12 jurors and passed them for cause; whereupon, the State then exercised its first preemptory challenge and excused one of the 12 jurors. At 10:50 a. m., the court inquired of the jury panel if any of them had read, heard, or seen anything about the case since they came to the courthouse the previous morning. Those jurors who acknowledged that they had were then questioned by the respective parties in chambers. Some of the jurors were excused by the court for having read about or discussed the case; some were excused from further attendance for other reasons. Neither the State nor the defense objected to the discharge of these jurors. The proceedings in chambers terminated at 11:40 a. m. and at 11:45 a. m. the jury was seated in the box and voir dire examination resumed with the County Attorney examining the prospective juror who was called after the 12th juror had been pre-emptorily challenged by the State. This juror, Mrs. Shoemate, was challenged for cause and thereafter Mr. Clarence Kepler was called as a prospective juror on voir dire examination. This juror was passed for cause by the State (C–M 246) and defense (C–M 251). Whereupon, the defendant exercised his first pre-emptory challenge. Mr. Carl Kickingbird was then called as a prospective juror and was passed for cause by both the State (C–M 254) and defense (C–M 255). Whereupon the Court recessed at 12:00 with the usual admonitions and court resumed at 1:30 p. m., at which point the defense exercised its second pre-emptory challenge. Mr. Robert McDaniel was then called and passed by the State (C–M 261) and passed by the defendant (C–M 265). The State then exercised its third pre-emptory challenge and Mr. Alvin Tatum was called as a juror and

passed for cause by the State (C–M 268), and passed by the defendant (C–M 272). Defendant then exercised his third pre-emptory challenge and Mr. Walter A. Shepherd was called, but was challenged by the State (C–M 273), with no objection by the defense and Mr. Shepherd was excused. Reba Barrett was then called, and was passed for cause by the State (C–M 275), and passed for cause by the defense (C–M 282). The State then exercised its fourth pre-emptory challenge and Herman Eden, Jr. was called as a prospective juror, but was challenged by the State (C–M 282), with no objection by defendant. Mr. Darzenkiewicz was then called and passed for cause by the State (C–M 284), and passed for cause by defendant (C–M 289). Defendant then exercised his fourth pre-emptory challenge and Mr. Charles Yeck was called, but was challenged by the State (C–M 290), with no objection by defendant. Mr. Charles H. Schmitzer was then called, but was challenged by the State (C–M 291), again with no objection by defendant. Mr. M. E. Girard was then called and passed for cause by the State (C–M 293), and passed by defendant (C–M 296). The State then exercised its fifth pre-emptory challenge and Goldie Wade was called, but was challenged by the State (C–M 299), as she had worked for one of the defense counsel and defendant agreed. Frank Jenkins was then called and passed for cause by the State (C–M 303), and passed for cause by defendant (C–M 308). Defendant then exercised his fifth and last challenge, and David Lee Barger was called as a prospective juror and was passed for cause by the State (C–M 309), and passed for cause by the defendant (C–M 313).

At this point in the proceedings the 12 jurors to whom the case was ultimately submitted, were duly empaneled and consisted of the following residents of Canadian County: Lawrence Gatz, William Hanson, Clarence Kepler, Carl Kickingbird, Alvin Tatum, Frank Jenkins, Buddy Alexander, Thomas B. Rains, Vernon Urban, David Lee Barger, Raymond L. Morris and Robert McDaniel.

Thereafter, further voir dire examination continued for the selection of two alternate jurors, but since they did not participate in the deliberations when the case was finally submitted, we deem it unnecessary to consider the proceedings relating to their selection; suffice it to say that at the conclusion of the selection of the alternate jurors, the defendant renewed his Motion for Continuance on the "grounds set forth" and for the reason of the hostility in the community. This Motion for Continuance was by the court overruled. The jurors were thereafter sequestered by the court until they returned the verdict.

In his brief, defendant contends that three of the jurors (Gatz, Urban and Alexander) selected to consider the case when it was ultimately submitted, had expressed various degrees of an opinion of the guilt of the defendant and that a fourth juror, selected as an alternate (Davis), had also expressed an opinion as to the guilt of the defendant which would take evidence to remove.

We reiterate that since Mr. Davis was an alternate juror and was not on the jury to which the case was ultimately submitted for deliberation, it is unnecessary to consider whether he was qualified to sit on the jury.

At the outset we observe that none of the jurors to whom the case was ultimately submitted of whom defendant now complains, were challenged for cause, except Mr. Alexander, and this challenge for cause was withdrawn by the defendant. We reiterate that since the issue here presented is one of the crucial issues in this appeal, we deem it necessary to set forth in detail the examination of jurors Gatz, Urban and Alexander on voir dire, in response to questions propounded by the respective parties and the court as they relate to this issue.

From the record it appears that Mr. Gatz is a farmer, living in Union City, Oklahoma, and is the father of two girls and one boy, whose ages at the time of trial were

eleven, ten and nine. From the record the pertinent questions and answers appearing in the Case-made, at pages 43–65, are as follows:

"MR. BILL BERRY: Now, the remainder of these questions, I hope none of you will think that I am being repetitious or unduly boring but I want to ask them of you individually.

There will be some changes in them, but basically these questions are the same.

Mr. Gatz, I would like to start with you now and ask you some individual questions which will be your qualifications to sit as a Juror.

The complaining witness in this case is a fifteen year old girl by the name of Sherri Noble and she through the County Attorney's Information alleges that Bill Shapard raped her, based upon this charge or her information and as I have explained to you the County Attorney has filed this charge and we are today defending Bill Shapard, John William Shapard.

Do you believe, Mr. Gatz, that he is entitled to make every reasonable effort to defend himself?

MR. GATZ: Yes, sir.

BY MR. BILL BERRY: (Continuing)

Q. Do you believe that when one person makes a charge against another that the person who is accused has a right to make an investigation into the background of the individual who has made these charges against him?

A. I think so.

Q. You think so?

A. (Nods head).

Q. Well, now then, do you think there is anything wrong with me as the lawyer for this boy or for the people working for me, I having accepted as a lawyer employment in this case, going out to talk to people who have known this fifteen year old girl, the complaining witness, in an effort to find out what kind of a person she is or was at the time of this alleged crime?

Do you see anything wrong with it?

A. I don't really think so.

Q. Now, the Judge at the conclusion of this case, you are going to hear the evidence from the witness stand but at the conclusion of this case, the Judge will instruct you on the law that is applicable to the facts in this case.

Those are the only two things under our system of judicial prudence in arriving at this decision in this case. You are the triers of the facts and you are, Mr. Gatz, the sole determiner of the weight and credibility to be attached to any testimony of the witnesses and the Court will so instruct you that credibility of the witnesses is an issue in this case.

Now then, do you believe that is—again this is slightly repetitious but that is all right for this boy and his lawyer to exert every reasonable effort to obtain evidence that establishes that the witnesses are credible?

A. Well, I think that is part of it.

Q. Now then, even though the complaining witness is a fifteen year old girl in this case, do you believe and are you satisfied that this boy can question her credibility without you thinking he is taking unfair advantage of her?

* * * * * *

A. I think so.

Q. Mr. Gatz, we know through our experience we have in common with each other, some people are truthful and some people aren't, is that right?

A. That is right.

Q. And some people may be more truthful than others, isn't that correct?

A. (Nods head)

Q. And, so you have no quarrel of this boy's right to establish by competent evidence that what this girl says is untrue if he can so establish that?

A. I think that is right.

Q. All right, you do not feel then at this time that a fifteen year old girl can only tell the truth that is she is not ca-

pable of telling anything but the truth. You don't feel at this time that just because she is a fifteen year old girl she is not capable of telling anything but the truth?

A. No.

Q. And, not only insofar as the complaining witness is concerned but insofar as other witnesses which may be put on the witness stand by the State in support of their case, the State's case, I should say, do you believe that we also have a right to question their credibility?

A. I sure do.

Q. And then, you understand that you as the sole determiner of the facts, as a trier of the facts, you may attach what weight and credibility to any witness' credibility that you want to?

A. Yes.

Q. Now then, I must explain to you that the very nature of this case is going to require considerable in the way of testimony about sex (spelling) s-e-x, I anticipate that on occasion that the testimony is going to border on the sordid and you may or may not, as I anticipate hear four letter words used from the witness stand and possibly by the lawyers in eliciting testimony from the witness stand.

Would this in any way shock your conscience to the effect that you think it might interfere with your deliberations in this case?

A. I don't think so.

Q. Then it might develop that I, on behalf of my client out of necessity must necessarily elicit or bring out matters which are not going to be pleasant to your ears or to anybody else's. If I do so, this will be in the effort to present the facts in this case to you.

* * * * * *

Q. Mr. Gatz, on behalf of my client, Bill Shapard, I may find I will necessarily have to elicit matters that wouldn't be pleasant to listen to. If I do this, this is going to be in an effort to present the facts to you in this case and I want to know now whether you will take offense to it if it is unpleasant and hold it against me or my client because of the nature or connotation may be offensive?

* * * * * *

A. I don't think so.

Q. I'll anticipate that the complaining witness will take the witness stand and that I will cross examine her at length and I may have to ask her questions on cross examination that I won't even discuss in the presence of my daughter but it will be in an attempt to put before you the facts in this case.

Are you going to take offense if I ask the complaining witness—I am a forty-four year old and this is a fifteen year old girl—things that would ordinarily be offensive, are you going to hold it against me and my client?

* * * * * *

You would not be offended?

A. I think anything permitted by the Court would be all right with me.

Q. Let me put it another way. If I do anything as a lawyer in this case which offends you, you would not hold it against this client?

A. I sure wouldn't.

Q. This case as it has been brought previously today has received considerable publicity in the form of newspaper print, radio announcements or stories, television reports and presentations and I anticipate that this publicity will continue throughout the trial, Mr. Gatz, and I want to know at this time, the Court may—I may request him to impound or sequester the Jury and by that I mean hold the Jury together during recesses, during lunches, and at night, throughout the trial of this case.

This is a matter which the Judge may or may not do. I can only inquire at this time and presume for the purpose of this question that he will, that I may request him to do that, and this will probably be rather a protractive proceedings and we

may run over into Thanksgiving, new week.

Now if you are held together, and if you feel—would you feel that if I would request you—suppose I just told you that I am going to request that the Jury be held together and you are permitted to—you are retained as a Juror in this case and you are going to be with the other eleven people in this trial, would that in any way cause you to have any feelings against me or my client in your deliberations of this case?

A. I don't think so.

Q. This is a request that can be made both by the prosecution or the defense and they may or may not make it and I can't tell you at this time if I may request that or the Court may do it or Mr. Harris and I may never say a word.

Mr. Gatz, prior to your selection and prior to your being summoned, I should say as a prospective juror in this proceedings, have you heard other persons express an opinion as to the guilt of Bill Shapard or any of these boys?

A. Well, I don't know about the guilt itself but I have heard the crime discussed a lot, a lot of discussion on it.

Q. Have you ever heard anybody in your presence say as far as they are concerned, they are guilty?

A. I might have, there has been a lot of talk.

Q. Have you ever heard any person say they were innocent?

A. I don't think so.

Q. Have you heard anybody comment on the fact that these boys are rich boys and they will buy their way out of this?

A. Yeah, I have heard some talk about it.

Q. There has been considerable talk about it. I wanted to be sure if you heard it.

A. Yes.

Q. Did you hear the old saw of the thing kicked around about, 'well, boys will be boys'?

A. I don't think I heard that.

Q. Have you heard anything about this girl having suffered any sort of mutilation or injury?

A. No, I don't think so.

Q. Did you ever hear anything about anything said that they thought these boys ought to be taken out and hung?

A. Well, I heard pretty bad things.

Q. You never heard one person stand up and say that they oughten even to have a fair trial?

*　　*　　*　　*　　*　　*

Q. Have you had occasion to be in a church or your church or anybody's church and heard any sermons about this purported fact?

A. No sir.

Q. Ever attended any P.T.A. meetings or anything like that to have heard the purported testimony?

A. No, sir.

Q. Have you heard the prosecutor or his assistants talk at civic meetings about this?

A. No.

Q. Do you have any private information that has come to you by the purported facts in this case?

A. (Nods head)

Q. Your names as prospective Jurors were published in the newspaper and since you were summoned has anybody come up to you and remarked to you about reading about the fact that your name was in the newspaper and you were serving on the Jury in this case?

A. There has been several people that said they knew I was going to be on it.

Q. They knew that you were going to be called on this case?

A. Sure, yes, sir.

Q. Did they make any remarks in your presence about their innocence or guilt?

A. Yes, like I said there has been a lot of talk.

Q. This has been since you were summoned as a Juror and none have ever told you that they were innocent and they all told you that they were guilty?

A. I don't know if all of them said they were guilty or not. There is more talk about what they feel ought to be done if they were found guilty rather than guilt.

Q. Have you ever expressed any opinion one way or the other yourself?

A. About whether they are guilty?

Q. Yes.

A. No, sir, I haven't.

Q. And now, it has been brought out, I will tell you this because—I have got to tell you something else first, you know a man is presumed innocent until he is proven guilty beyond a reasonable doubt, is that correct?

A. Yes, sir.

Q. Do you also realize, Mr. Gatz, that you must give the defendant, Bill Shapard, the benefit of this presumption of innocence without any mental reservations whatsoever?

A. I think so.

Q. This is what is required, he is presumed innocent?

A. Yeah.

Q. And if you are permitted to remain on this Jury, you must presume him innocent without any mental reservations whatsoever.

A. Yes, sir.

Q. And, do you realize that you are to consider this presumption of innocence as actual proof of innocence until it is overcome by proof of guilt beyond a reasonable doubt?

A. (Nods head)

Q. Now then, Mr. Gatz, do I have your promise that you will give this defendant Bill Shapard the full benefit of the presumption of innocence?

A. Yes, sir.

Q. Now then, I am sure that you do, do you realize that you are entitled to decide for yourself whether a doubt that you may entertain is reasonable or not and nobody else is entitled to tell you whether this is reasonable or not but you are to determine whether it is reasonable or not that is your decision?

A. Yes, sir.

Q. If you have a doubt and if this doubt appears reasonable, do you—can you and will you maintain your individuality and not surrender your judgment to another Juror or other Jurors and hope to acquit the defendant?

A. Absolutely, I think that is my privilege.

Q. You make your decisions and you stay with it?

A. Yes, sir.

Q. Now then, the Court will instruct you that the prosecution must prove every element of this crime beyond a reasonable doubt and he will tell you what the elements are contained in the charge that is filed and they must prove every single solitary element of the crime beyond a reasonable doubt.

Now then, if they do not establish beyond a reasonable doubt every ingredient to your satisfaction, will you acquit him?

A. Yes, sir, if I don't get the doubt out of my mind.

Q. Regardless of these things that you have seen or heard?

A. I think whatever happened will be what my decision will be based on.

Q. So you wouldn't surrender your judgment you would stay right with it and you will make the State prove beyond a reasonable doubt every single ingredient or element of the Information as the Court says must be done?

A. Yes, sir.

Q. Will you promise me that you will not in any way engage in any form of speculation as to what may or may not have been the facts in this case?

A. If something wasn't proven fully to my satisfaction.

Q. Will you permit any speculation to fill in that void, will you say, 'well, it wasn't proven as far as I am concerned; that is it'?

A. No.

Q. Will you or will you not engage in the possibility or probability regardless of how strongly you feel about it if you don't believe that is proven beyond a reasonable doubt you will disregard it?

A. That is right.

Q. This is the charge that has been brought against the defendant Bill Shapard, Mr. Gatz, that he, '. . . did then and there wilfully, unlawfully, wrongfully, and feloniously, and by means of force overcome the resistance and by means of threat of immediate injury and great bodily harm, accompanied by apparent power of execution, and preventing resistance by then and there striking, beating, bruising and maltreating and holding one Sherri Noble, a female of the age of fifteen years, and did and then have and hold sexual intercourse with the said Sherri Noble, a female of the age of fifteen years, and not the wife of the said defendants, or any of them, and the said defendants being male persons under the age of eighteen years—and said act of sexual intercourse being accomplished by the said defendants after having by force overcome the resistance of the said Sherri Noble, and without her consent and against her will.' They must establish beyond a reasonable doubt Mr. Gatz, every single element of this charge.

* * * * * *

Q. That is what I am talking about, Mr. Gatz, is [sic] the ingredients of the elements of the crime must be proven each and every one of them and the Court will instruct you as to what the ingredients or what the elements are and you will then require them to prove every single one of them before you will convict Bill Shapard.

A. Well, you mean that we have to stay until we know every bruise and everything?

Q. No, no.

He will instruct you as to the ingredients of that crime and what must be proven before it can then constitute a crime but each and every one of these things has to be proven beyond a reasonable doubt, not just a part of it, that is the point that I am trying to get over to you.

If they just prove part of it and they don't prove the other or some reasonable doubt is existing in your mind of the others then you must vote to acquit him and you would have no hesitation in doing so?

A. I don't believe so.

Q. Regardless of all of the conversations you have had in your background, is that right?

A. That is right.

Q. You understand that the burden of proving the defendant guilty beyond a reasonable doubt rests with the prosecution and that Bill Shapard need not introduce any evidence whatsoever to establish his truth, do you understand that?

A. (Nods head)

Q. The burden remains with them throughout.

Now knowing that, that is that they have the burden and that he doesn't have to do anything to establish his innocence, knowing that would you require him at any time to satisfy you as to his innocence?

A. I don't think so.

Q. Is there question in your mind about it because this is very important. If there is any question in your mind that you think this boy has to do anything to satisfy you as to his innocence.

A. I don't think so.

Q. You don't know?

A. No, sir.

Q. You so far as you know that anything that I have asked you about up to date that you have heard about, you are still going to make the State prove him guilty?

A. Yes, sir.

Q. All right, now then, knowing that he is not bound to explain his side of the case that he is not bound to satisfy you of his innocence, would you—you would not would you Mr. Gatz consider that my client's failure to testify would be an indication of guilt would you?

A. No.

Q. I am not telling you that he will or will not testify but what I am trying to tell you is that he does not have to do anything to establish his innocence and if he doesn't take the witness stand in his behalf this you would not consider as an admission of guilt, would you Mr. Gatz?

A. No.

Q. Knowing that this crime, that is the charge against Bill Shapard is rape or a sex crime, can you give him the same fair trial that you would give him if it were a lesser crime, say if he were charged with some misdemeanor such as running a stop sign?

A. As far as guilt or innocence, yes.

Q. The magnitude of the crime doesn't cause you to have any feelings one way or the other?

A. I don't think so, I don't think that is part of it.

Q. You testified that you have heard some comments one way or the other about guilt and innocence and these other things, do you know anything about the facts of this case other than what you have heard thus far today?

A. Well, you mean if I read it in the newspapers or heard it on television?

Q. Do you know of the purported facts other than what you have heard today?

A. I think so, probably, I have heard television and read newspapers.

Q. You have read the newspapers and you have heard the television and radio reports concerning it?

A. Yes.

Q. Now, then, when Mr. Harris was examining you, he asked you whether or not you had an opinion about the facts or purported facts in this case and from what I have heard from you I suppose that you do have some opinion as to the guilt or innocence of this boy or about the merits of this case and from what you have heard or read or seen in the newspapers?

A. I don't believe I do really. As far as saying he is guilty, I think, I could sit right up here and listen to the testimony and decide for myself.

Q. Have you, now this case was filed back on July 8th, I think, that is the publication or news started reporting it on July 8th and living in Union City, you are within Channel 4 and 5 and 9's area. You pick up all of these things I take it?

A. Yes.

Q. Do you take the Oklahoma City newspapers?

A. No, I have got the El Reno Sunday paper.

Q. Have you heard, seen, or read any purported facts to the effect that this boy committed an act of sodomy?

A. Yeah, I wouldn't say exactly, actually I haven't been keeping that close of a touch. I know that I read of it.

Q. Does this fact that you have read this now affect you so that you might have some impression or opinion about the purported facts in this case or about the merits in this case?

A. I don't think it has. I haven't thought about it until you mentioned it.

Q. It will come out during this case and I don't want it to come as any surprise at that time and I wanted to know whether you had read it and having recalled it,

did you form any impression when you read about that part of it?

A. I don't think so, it has been a long time. I haven't tried to keep up with it at all.

Q. Did you read in the newspapers the purported quotations of the County Attorney in which he said that he had received a medical and it was 'a good record for our side of the case,' do you remember reading or hearing that?

A. I read it in the papers but that particular part I don't know.

Q. Do you remember reading any statements about purportedly quoting the complaining witness in which she said she was drug in the car that a knife was used or that she was tied up, do you remember reading anything about those things?

A. Like I said when it happened I read it all in the newspapers.

Q. Did you read the accounts of the statements of and obtained by then a co-defendant, Johnny Ishmael by the County Attorney?

A. I don't know if I read it or heard it.

Q. You have heard about it?

A. Yes.

Q. None of these things that you have heard or read have caused you to arrive at any impression or any opinion about the merits of this case now which will require me as an attorney for this boy to put on any proof to remove these things from your mind?

A. I think I came in here with an open mind.

Q. All right sir, knowing what you know about this case as it has been brought out by my questioning here, would you be satisfied to be tried by a Jury or a Juror having your frame of mind?

A. That is what I am trying to do to put myself over there.

Q. You would be satisfied if you were over there with a Juror in your frame of mind?

A. Yes, sir.

Q. Thank you.

Do you believe, Mr. Gatz, that you can judge this case solely upon the evidence before you and not allowing the fear of later criticism affect your verdict?

A. I think so.

Q. If you came to a conclusion that the prosecution had not proven the guilt of the accused beyond a reasonable doubt but you found that a majority of the other Jurors did believe that the boy was guilty would you change your verdict simply because you are of the minority?

A. No, sir, I am an individual.

Q. Would the fact that you were in the minority influence your decision at all?

A. No.

Q. If from your experience and knowledge that you believe or have the feeling that certain facts do exist that these facts have not been proven by satisfactory evidence you can disregard your beliefs or feelings?

A. Yes, I believe so.

Q. Even though you feel that something has been left out or more is to come in, you can disregard it?

A. (No response)

Q. You understand that the comments that I may make or the Judge may make or the prosecutor may make do not constitute any evidence in this case, you understand that?

A. (Nods head)

Q. It is only what comes from the sworn witnesses.

A. (Nods head)

Q. Do you or have you ever heard, do you know what is meant by the term of accomplice as referred to in the prosecution or in the defense of cases of this sort of criminal charge?

A. I imagine.

Q. An accomplice in a crime is a person who took part in the commission of the crime or aided in it with the intent to assist in its commission.

MR. MOORE: We make an objection to his defining anything.

THE COURT: Sustained that will be taken up in the Court's instructions.

BY MR. BILL BERRY: (Continuing)

Q. Do you understand, you say that you have some idea of what accomplice, Mr. Gatz, you understand that the testimony of an accomplice is to be considered testimony from a tainted source and is to be scrutinized by you and—

MR. MOORE: Objection.

THE COURT: Sustained.

MR. BILL BERRY: Note our exceptions.

BY MR. BILL BERRY: (Continuing)

Q. Mr. Gatz, one last question as we come into this Court today does this boy have any strikes against him now as far as you are concerned?

A. I don't think so.

Q. All right does the fact that this boy is a son of a lawyer cause you to have any feelings one way or the other?

A. It sure don't."

This concluded the interrogation of Mr. Gatz; however, the following questions and answers were elicited in Chambers in regard to the newspaper article which had appeared in the November 17th *Oklahoma City Times*, beginning on page 203 of the Casemade, Volume I:

"(THEREUPON, Juror Gatz enters Chambers.)

THE COURT: Mr. Gatz who has previously been passed for cause. Have a seat Mr. Gatz.

BY THE COURT:

Q. What have you read if anything about this case in the newspapers?

A. Nothing.

Q. Have you heard anything on the radio this morning?

A. I woke up to it this morning. I have got a clock radio and I had it set for 7:00 o'clock, going to bed I always wake up at 7:00 o'clock news and of course it was on the headlines.

Q. What did you hear on the radio?

A. I don't—I wasn't really truthfully awake, wasn't paying attention to it. I know he said something about that and that and that and that he said sex (Spelling) s-e-x like it was put out.

Q. As though that was a statement that defense counsel made?

MR. BILL BERRY: A report on yesterday's proceedings?

THE WITNESS: I think that was probably what it was. I turned it off when I heard.

BY THE COURT:

Q. Have you seen or heard anything on television?

A. No.

Q. Has anyone discussed the case with you?

A. My wife asked me what happened and I headed it right off there and when I took the kids to school this morning there was a fellow who drives a propane truck and he comes up to me and says, 'I read all about you in the papers.' I said, 'That is so, you read about it in the paper. I ain't allowed to discuss it.'

BY MR. MOORE:

Q. Is your state of mind the same as yesterday?

A. I think so.

Q. It wasn't influenced by anything in the interim?

A. No, because I think I headed it off before.

THE COURT: Are you sure in your mind about that?

THE WITNESS: Yes, sir.

(THEREUPON, Mr. Gatz left Chambers.)"

The record reveals that Mr. Urban worked for the F.A.A., lived in Mustang, and was the father of three girls, whose ages were 12, 8 and 2, and one boy, age 9. He had worked for the F.A.A. since 1960,

his wife was unemployed and he had never had previous jury duty. Mr. Urban was asked essentially the same questions as those asked Mr. Gatz, the only other pertinent questions and answers being:

BY MR. BILL BERRY:

"Q. Did you read the newspapers about the purported acts of sodomy?

A. Yes, sir.

Q. About the medical report that the prosecution received?

A. I read something about the medical reports but I don't remember what essentially it was based on.

Q. A newspaper report that the police had obtained a photograph showing her bruises and battered condition?

A. No, sir.

Q. You never read any stories about the circumstances of how she was gotten in the car or a knife was involved or any of those stories, you don't remember any of those? ·

A. No."

\* . \* \* \* \* \*

Q. Is there anything whatsoever now, Mr. Urban, that I possibly don't know about which you maybe last night when you got home and recalled the questions that you heard me asking these other Jurors that you thought, 'Well, maybe this might effect my judgment,' and something I don't know about and consequently couldn't inquire?

A. No sir, I don't think of anything.

Q. And, so far as you are concerned now you can sit as a Juror and render a fair and impartial verdict?

A. Yes, sir.

Q. Were the situation reversed, you would be satisfied to have a Juror in your frame of mind sitting on your case?

A. Yes, sir, I sure would."

Mr. Urban had not read the newspaper article of November 17th; therefore, he was not questioned in Chambers.

The record reveals that Mr. Alexander worked for General Electric and lived in Yukon. He was the father of three sons of the age of 6, 8 and 12, and one daughter, age 10. His wife was not employed. Mr. Alexander was asked essentially the same questions as those asked of Mr. Gatz and Mr. Urban, the only other pertinent questions and answers being:

BY MR. BILL BERRY:

"Q. You, on voir dire examination by Mr. Harris, you said that you probably had some slight opinion you were sure but you thought you would be okay. You have had some time to deliberate further, is there any question in your mind what slight opinion that you might have had might effect your deliberations?

A. It wouldn't effect any decision I might make.

\* \* \* \* \* \*

Q. \* \* \* would there be any problems as far as you are concerned with this slight opinion that you would come in and fill up the hole on this reasonable doubt with this opinion that you formed before you heard the evidence?

A. No, sir, it wouldn't.

Q. All right, that is the best way I can explain what I am trying to get at.

A. My opinion is based on what I heard and read and saw so it is all hearsay.

\* \* \* \* \* \*

Q. Do you have at this time any mental reservations whatsoever about this presumption of innocence?

A. Not so far as the law is concerned.

Q. Do you have any mental reservations about the presumption of innocence of this defendant?

A. Only to what I have read.

Q. From what you have read? I will ask you this have you read anything about the purported acts of sodomy?

A. Yes.

Q. Have you read anything about the fact that the State said they had obtained a good medical report?

A. No sir.

Q. Did you read about the fact that the girl was pulled into the car and tied and taken out and raped at knife point?

A. No.

Q. Did you read anything about the fact that one of the codefendants made a statement to the County Attorney in which he said—he corroborated the girl's testimony?

A. Yes, I read that.

Q. Now, you say insofar as what you have read this causes you to have some mental reservations about the case?

A. I think it is impossible to read something and not have a feeling one way or the other.

Q. All right, you do. There is some concern in your mind that is not necessarily concern but you have some idea that because of what you have read you have an opinion at the present time as to the guilt or innocence of this defendant?

A. No, not so far as actual guilt or innocence but insofar as the opinion of the articles I have read, yes.

Q. You mean you have an opinion based on what these articles said?

A. Yes sir, I realize of course that those may or may not be true.

\* \* \* \* \* \*

Q. Well, the opinion that you have drawn but you do have an opinion that is what I am talking about?

A. Yes, sir.

MR. BILL BERRY: We will challenge this Juror.

MR. HARRIS: Objection to it, Your Honor, under the law if the Juror says he has a fixed opinion, but if he says yes he can listen to the evidence and the instructions of the Court and render a fair and impartial verdict and disregard anything that he might have heard or read before, he is qualified to serve.

THE COURT: Mr. Alexander, is it a mere impression that you have at this time or is it a fixed belief or an opinion?

MR. ALEXANDER: Well, it is an opinion. I really think anyone that reads anything cannot help having an opinion.

BY THE COURT: (Continuing)

Q. Let's forget about reading something and everything about this opinion. What I am asking is do you have a mere impression or is it a fixed opinion?

A. It is just an impression, not a fixed opinion.

MR. BILL BERRY: We would withdraw our challenge Your Honor.

THE COURT: All right.

\* \* \* \* \* \*

Q. Knowing what you know about this case now and being in the frame of mind that you are would you be satisfied to have a Juror sitting with your frame of mind sitting on your case?

A. I think so.

Q. If you came to the conclusion that the State had not proven this boy guilty beyond a reasonable doubt and had started deliberations about it and you found yourself, talking about the football the lonesome end, sitting out there all alone of the other eleven, but you are satisfied but you have a reasonable doubt and will you hold to your conviction and would you vote to acquit this defendant or accused in this case?

A. Yes, sir, I think that is my right.

Q. Yes, sir it is the right—your right that there is eleven of them against you and you said, 'no, sir, I have a reasonable doubt.' The mere fact that the majority is against you, you are not going to let that effect you in your judgment in any way?

A. No, not at all.

Q. Do you know anything which you might have reflected upon over night after hearing these questions that consequently I don't know about and can't inquire about to prevent you from sitting as a fair and impartial Juror in this case?

A. I can't think of a thing."

Mr. Alexander had not read the newspaper article of November 17th and was not questioned in Chambers.

As we have heretofore stated, the only challenge for cause made by the defendant against the jurors who ultimately served, was that made by defense counsel to Mr. Alexander and this challenge was withdrawn by counsel for defense.

 We could have summarily disposed of this contention by reason of the failure of the defendant to challenge any of the jurors for cause and preserve the record by taking exception to the ruling of the court denying said challenge; however, we need not rest our opinion on this procedural technicality. Title 22 O.S. § 662, provides in part:

"* * * no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered upon the minutes of the court."

The particular language in this statute is almost identical with the language of the United States Supreme Court in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751, wherein the Court, speaking through the Honorable Justice Clark, stated the following:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*" (Emphasis ours.)

 In applying the rules set forth in Irvin v. Dowd, supra, and on the basis of a thorough study of the record of the voir dire examination of the jurors selected to whom the case was ultimately submitted, we are of the opinion that the defendant's contention that he did not receive a fair and impartial trial by reason that a fair and impartial jury could not be obtained from the inhabitants of Canadian County, is not supported by the record. The jurors who were extensively examined by defense counsel, who was given wide latitude, as to their qualifications *all* stated that they would base their verdict on the evidence presented and lay aside any impression or opinion which they might have formed as a result of what they had read or heard discussed.

To summarize our holding in the instant case, we are of the opinion, on the record before us, that this case is distinguishable from the cases of Irvin v. Dowd, supra, Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, and Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed. 2d 543 (relied on by the defendant) in the following particulars:

In the instant case (a) None of the jurors were challenged for cause; (b) All of the jurors unequivocally stated that they would base their verdict on the evidence presented and lay aside any impression or opinion which they might have formed as a result of what they had read or heard discussed; (c) Defendant was represented by several capable attorneys of his own choice and was allowed to extensively examine the jurors called; and (d) The punishment

fixed by the jury was five years imprisonment, one-third of the maximum sentence which could be imposed.

In the Irvin case: (a) Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief; (b) One of the jurors said that he "could not * * * give the defendant the benefit of the doubt that he is innocent." Another stated that he had a somewhat certain fixed opinion as to the defendant's guilt; (c) Defendant was represented by court-appointed counsel who did not examine ten members of the jury panel as to whether or not they had an opinion as to the guilt of accused. Ninety per cent of the jurors called and examined on this point, indicated some opinion as to the guilt ranging in intensity from mere suspicion to absolute certainty; (d) Defendant was sentenced to the maximum punishment that could be imposed —death.

The instant case is clearly distinguishable from Sheppard v. Maxwell, supra. In the instant case a change of venue was granted from the county where the crime was allegedly committed and the jury was sequestered throughout the trial and until they had returned a verdict. The jury was not permitted to read newspaper articles of the trial, watch television, or listen to the radio concerning it. The press and radio were not permitted to create the carnival-like atmosphere that characterized and typified the nine-week Sheppard trial in Cleveland where, *throughout the course of the trial,* the jury had free access to the radio and press releases concerning the trial. In the Sheppard case the trial judge, who had refused to grant a change of venue, or a continuance, would not permit defense counsel to question the jurors concerning whether they had read or heard the prejudicial news releases and comments of nationally known newscasters. The Judge advised defense counsel that:

"Well, I don't know, we can't stop people, in any event, listening to it. It is a matter of free speech, and the court can't control everybody * * * We are not going to harass the jury every morning * * * It is getting to the point where if we do it every morning, we are suspecting the jury. I have confidence in this jury * * *."

After the Sheppard case was submitted to the jury, it was sequestered for its deliberations, which took five days and four nights. After the verdict, defense counsel ascertained that the jurors had been allowed to make telephone calls to their homes every day while they were sequestered at the hotel. Although the telephones had been removed from the jurors' rooms, the jurors were permitted to use the phones in the bailiffs' rooms. The calls were placed by the jurors themselves; no record was kept of the jurors who made calls, the telephone numbers or the parties called. The bailiffs sat in the room where they could hear only the jurors' end of the conversation. The court had not instructed the bailiffs to prevent such calls. By a subsequent motion, defense counsel urged that this ground alone warranted a new trial, but the motion was overruled and no evidence was taken on the question.

In Estes v. State of Texas, supra, the Supreme Court of the United States held that the telecasting and broadcasting of the pretrial hearing on the motion to ban the telecasting of the trial and the subsequent telecast and filming of the trial, violated the defendant's right to a fair and impartial trial and reversed that conviction. In the instant case there was no telecasting of the pretrial motions, nor was there telecasting of the trial itself, and the rule enunciated in Estes has no application to the instant case.

We are of the further opinion that defendant's contention that 22 O.S. §

561[1] is unconstitutional and in conflict with the Oklahoma constitutional provision of Article 2, Section 20[2], is not properly before us since we have determined that a qualified and impartial jury was selected from the inhabitants of Canadian County. Moreover, we observe that had the trial judge determined, either on the motion for a second change of venue, or voir dire examination of the jury, that he could not secure a fair and impartial jury from the residents of Canadian County, he would not have been prevented from granting a change of venue to another county within the state since 22 O.S. § 561 does not expressly prohibit a second change of venue to a county outside the judicial district when an impartial jury cannot be selected from the counties within the judicial district.

The court recessed the proceedings in order that out-of-state depositions might be taken in San Antonio, Texas, and the trial resumed on November 22, 1965. The 12 jurors remained sequestered throughout the trial until they returned the verdict and the two alternate jurors were sequestered until they were discharged by the court.

Prior to discussing the evidence offered on behalf of the State, we will here consider the defendant's assignment of error that the trial court erred in failing to require the County Attorney to allow pre-trial inspection of the medical report of Dr. Deupree, and the statements of witnesses Johnny Ishmael, the prosecuting witness, and Corky Brown, a sufficient length of time prior to trial in order to properly prepare the defense.

In considering this assignment of error we observe that, as appears from the transcript of preliminary hearing, the defendant was allowed to extensively cross-examine both the prosecutrix and witness Ishmael and again these witnesses were cross-examined during the trial. Although Corky Brown was not produced as a witness at the preliminary hearing by the State, he was extensively cross-examined by the defense on the trial of the case.

Although defendant relies on Layman v. State, Okl.Cr.App., 355 P.2d 444, and State ex rel. Sadler v. Lackey, Okl.Cr., 319 P.2d 610, those cases are clearly distinguishable from the instant case.

In the Lackey case the trial court allowed pre-trial inspection of an F.B.I. report of the analysis of paint scrapings allegedly matching the paint on the vehicle belonging to the defendant. This Court, in sustaining the trial court's action, held that the trial court did not abuse its discretion in admitting such evidence although the court did not go so far as to state that the defendant had an absolute right to pre-trial inspection. We believe that the following language in the Syllabus of the Court in State v. Lackey, supra, clearly distinguishes it from the instant case:

"1. The defendant in a criminal case has no absolute right of pre-trial inspection of an F.B.I. report in possession of the prosecutor merely because he believes it may be beneficial to him.

2. The defendant has no inherent right to examination of the state's evidence in the hope that something may turn up which would aid or supply clues for gathering evidence.

3. In the interest of justice, for good cause shown, where the denial of pre-trial inspection of a report in the posses-

1. "Any criminal cause pending in the district court may, at any time before the trial is begun, on the application of the defendant be removed from the county in which it is pending to some other county in said judicial district, whenever it shall appear in the manner hereinafter provided, that the minds of the inhabitants * * * are so prejudiced against the defendant that a fair and impartial trial cannot be had therein."

2. "In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed: Provided, that the venue may be changed to some other county of the State, on the application of the accused, in such manner as may be prescribed by law."

**594**

sion of the prosecution might result in a miscarriage of justice, the trial court has the inherent right in exercise of sound judicial discretion to grant the remedy of pre-trial inspection of a report in the prosecution's possession where the primary source is no longer in existence and the report constitutes the only available source of evidentiary information."

In Layman v. State, supra, this Court said:

"In cases involving an intricate, specialized, report of a highly technical and scientific nature, supported by graphs, charts, pictures, an engineer's calculations, and computations couched in highly professional terminology, even-handed justice requires pretrial examination of such report where the same constitutes evidence of the matter charged. But this right does not permit unbridled inspection of the prosecutor's files; but only that matter which is in the nature of a highly technical report."

▉ In the case at bar, defendant was not attempting to inspect a "highly technical report of an investigation which was scientifically completed and months in the making," but rather statements in the files of the prosecuting authorities made by witnesses, all of whom the defendant was given a right to extensively cross-examine. We here follow the general rule as expressed in 23 Am.Jur.2d, Depositions and Discovery, § 317, as follows:

"Pretrial discovery and inspection by the defendant of written statements of witnesses or prospective witnesses for the prosecution have been generally denied. Thus, it has been held that an accused is not entitled to discovery and inspection of statements of a prosecution witness in the possession of the state, of the transcript of the statement of a state witness taken before a prosecuting officer preparatory to trial, or of the 'work product' of the prosecutor consisting of statements signed by others than the defendant."

▉ We further observe that although the defendant was not, at preliminary hearing, given a copy of Dr. Deupree's medical report on examination of the prosecutrix, such report was made available to him before trial and neither the State nor the defendant sought to offer the testimony of Dr. Deupree on this matter. Under these circumstances we are of the opinion that the defendant's contention is without merit.

During the trial as a part of the State's case in chief, the State called the prosecutrix whose testimony in substance was as follows: that she, a 15 year old white female at the time of trial, had been visiting in Oklahoma City, but her home was in San Antonio, Texas. She testified at the trial that she and her cousin, who was 17 at the time, had gone to get a coke around 8:30 or 9:00 p. m. on July 7, 1965, and four boys, Charlie Felix, Johnny Ishmael and Michael and Richard Stanley, stopped in their car and asked the two girls if they wanted to go with them to get a coke. Since the cousin knew one of the boys, they did go with them to the Sir Burger. They went several other places and on 53rd Street in Oklahoma City, at a place referred to as a "monument place," they met another group of boys, identified as Bill Shapard, David Fellers, Paul Brogan and two other boys. The prosecutrix got out of the Felix car; however, the cousin did not. There was some mention of going horseback riding, but the prosecutrix stated that she had to go home. Mike Stanley took her by the arm and led her to the car. She stated that as they drove away she screamed for her cousin to help her, but by this time they were too far away. Her testimony revealed that Bill Shapard was the driver of the car, and the other boys in the car with her were David Fellers, Mike and Richard Stanley, Johnny Ishmael, Paul Brogan and Larry Smith. She stated that they drove past Edmond, Fellers got out of the car and unlocked the gate, they went up a hill and then stopped. The boys were quiet and stated that they did not want to scare the horses. Michael Stanley tried to kiss her and she told him to leave her alone. She further testified

that the boys started taking off her clothes, at which time Bill Shapard said for them not to tear her clothes or bruise her because they didn't want any marks left. They then held her, removed her clothing, then removed their clothes, and each raped her with the exception of Johnny Ishmael whom she stated would have helped her if he could. She testified that Bill Shapard raped her first, then Larry Smith, the Stanley twins, Paul Brogan, David Fellers and Bill Shapard again. She further stated that all of the boys, with the exception of Ishmael and Brogan, made her practice oral sodomy on them. The first to do so was Bill Shapard, then the others, and on the way home, Michael and Richard Stanley and Larry Smith. She testified that there was mention of a knife "to keep her quiet"; however, she never did see the knife. The boys took her back to the Split-T and told her they would take her home; however, she told them "No" and got out of the car, went to the carwash where Corky Brown was washing his car, and asked him to take her home.

The next witness called was Johnny Ishmael who was originally a co-defendant, but charges had been dismissed against him and he had been granted immunity to testify. His testimony in substance was essentially the same as that of the prosecutrix leading up to the alleged rape. He testified that when they got to the open field everybody got out of the car except the prosecutrix and one of the Stanley twins. The other boys, except he and Brogan, went back to the car and started taking the prosecutrix's clothes off, at which time they were all holding her. They directed him to go back and close the gate, which he did, and upon his return to the car he saw Bill Shapard and the prosecutrix in the back seat of the car, Larry Smith had his hand over her mouth, and Bill Shapard was having intercourse with her. He stated he sat on the hood of the car about 45 minutes, but did turn around and saw the following have intercourse with her: Bill Shapard, David Fellers, both Stanley twins and Larry Smith. He stated she screamed and cried for about an hour and kept begging them to take her home. He further stated that all the way back one of the Stanley twins and Larry Smith were making her do oral sodomy. He testified that they all came back to the Split-T to pick up his car; that Bill Shapard went home alone in his car; and he took the other boys home in his car that had been left at the Split-T.

It was at this point of the proceedings that one of the defendant's assignments of error arose. It is contended that "the witness, Ishmael, lied stating that he had not been granted immunity from prosecution, which fact was known and adopted by the prosecuting attorney which impaired the jury's ability to pass on his credibility." In support of this contention the defendant cites the following proceedings which occurred in El Reno, Oklahoma, in the chambers of Judge Boston Smith, with all parties present:

"THE COURT: Let the record show that in Chambers out of the presence of the Jury all of counsel of record appears as well as Mr. John Dudley, Attorney at Law, and with him Mr. Johnny Ishmael.

MR. DUDLEY: If the Court please, I want the record to show that Johnny Ishmael is present. At one time Johnny Ishmael was charged with the crime that is now on trial. I want the record to show that on or about the 30th day of July, 1965, an offer of immunity given by Curtis Harris which offer was accepted on that day by Johnny Ishmael also on that date this matter was taken up with Judge W. R. Wallace then District Judge of Oklahoma City who approved the offer of immunity.

At that time a voluntary statement of Johnny Ishmael was turned over to the County Attorney and Johnny Ishmael subsequently on that offer of immunity testified at a Preliminary Hearing in this case. He has again been subpoenaed as a witness.

At the conclusion of the Preliminary Hearing upon the motion of his counsel, the charges were dismissed as to him.. There might be a possibility that the charges could be refiled and for that reason I want to make a record again regarding his immunity.

He is either immune or I would like for the County Attorney to reaffirm the offer of immunity made on July 30 so this witness may testify.

MR. HARRIS: The State subpoenaed Johnny Ishmael as a witness and by the authority of the Constitution of the State of Oklahoma, Article 2, Section 7, we are prepared to use the authority of the Office of the County Attorney to grant complete immunity of prosecution for this crime of Rape in the Second Degree submitted on the 7th day of July, 1965, against the victim Sherri Marie Noble. We are also prepared to use the full authority to grant a full and complete immunity for any possible implication of any crime that may involve Johnny Ishmael that he may be asked to testify to, the only condition we make is that he verify and testify to the truth and the whole truth fully and completely and nothing but the truth and in so doing he implicates himself in any type of crime of rape, we will not file any charges on Johnny Ishmael.

MR. DUDLEY: On behalf of Johnny Ishmael, Johnny you have heard the County Attorney.

MR. ISHMAEL: Yes, sir.

MR. DUDLEY: And do you accept that offer of immunity.

MR. ISHMAEL: Yes, sir."

Appearing at page 503, Vol. II of the Case-made, the following appears on cross-examination of Johnny Ishmael:

"BY MR. BILL BERRY:

Q. Johnny, you are here testifying after having been granted immunity by the Court, are you not?

A. Yes, sir.

Q. Prior to the time you made your statement or statements to the County Attorney upon which the immunity was granted, did you have an opinion or access to the newspaper accounts of the incidents which are involved here today?

A. No, sir.

Q. You had not read anything in the newspapers at all ever?

A. About the trial?

Q. Well on August 8 is about the time that you made your statement, is it not?

A. Yes.

Q. And, between July 7 and August 8, you never did read any newspaper articles or accounts or heard any television or anything over the radio about what occurred over July 7, 1965?

A. I did read the papers but it didn't have much in it.

Q. What paper were you reading?

A. The Oklahoman.

Q. You must have been reading a different copy than I was. * * *."

Further, appearing at page 524, Vol. II, of the Case-made:

"BY BILL BERRY:

Q. The charge against you was dismissed after you testified at the Preliminary Hearing, was it not?

A. Yes.

Q. You were there?

A. Yes.

Q. You heard Mr. Harris get up to tell the Committing Magistrate or Presiding Magistrate that the charge should be dismissed against you, didn't you?

A. Yes sir.

Q. You knew that it was going to be dismissed, didn't you, because you had been before Judge W. R. Wallace prior and been granted immunity?

A. No, I was never before Judge Wallace.

Q. You went before the Judge, did you not, before you testified at the Preliminary Hearing?

A. No.

Q. You say that you did not?

A. Yes.

Q. You have been granted immunity here today and you were present in the Court's chambers when it was granted along with myself and these other attorneys, were you not?

A. Yes.

Q. And you heard your counsel tell this Court in the record in this case that you had been taken before the Judge, Judge W. R. Wallace, Jr. and granted immunity on the 30th day of July, 1965, didn't you?

MR. HARRIS: Objection, that has no bearing in this case, incompetent, irrelevant and immaterial.

THE COURT: Could I see counsel at the Bench, please.

(THEREUPON, discussion was had at the Bench).

THE COURT: Objection will be overruled.

BY MR. BILL BERRY: (Continuing)

Q. Were you present back in the Court's chambers this morning?

A. Yes.

Q. And, you heard your lawyer say that you had been taken before the Judge on the 30th day of July, 1965, and been granted immunity, and he wanted it renewed here this morning before you got on the witness stand and you were present at that, weren't you?

MR. HARRIS: He did not say that and I'll challenge the record on that.

THE COURT: I don't recall that, Mr. Berry. Objection will be sustained.

MR. BERRY: We will challenge the record.

THE COURT: All right. That particular aspect of it, you mean whether he went before Judge Wallace or not.

MR. BILL BERRY: He has denied that he did prior to going on the witness stand to testify in the Preliminary which was September 7, 1965.

\* \* \* \* \* \*

Q. And you were taken by your lawyer before the Court and immunity was sought and obtained, did you understand that?

A. Well, before the Court, which Court?

Q. Well any Court, any Court if you are saying that I got the wrong Judge, I beg your pardon, Johnny. I don't want to split hairs with you, just any Court?

A. Well, the only Court that I know of was the Preliminary Hearing where he dismissed the charge, is the only one I know.

Q. Is it your testimony that no deal was made prior to that time in exchange for your testimony?

A. That is right."

At page 537 of Vol. II of the Case-made, when questioned by Mr. Harris, the following occurred:

"Q. Johnny, as counsel has brought out from you in the Court's chambers this morning you were granted immunity, were you not?

A. Yes.

Q. Do you know the terms and conditions of the granting of that immunity?

A. Well, the way I understood it, if you just told the truth that the law would just take its turn.

Q. And the Court told you that in granting you the immunity?

A. Yes."

Defendant relies upon Hurt v. State, Okl.Cr.App., 312 P.2d 169, which cites with approval People v. Savvides, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853, wherein it was stated:

"Savvides, learning of these matters, sought a writ of error coram nobis, which was denied by the trial court, and on appeal by the Appellate Division, but was allowed by the Court of Appeals of New York. The court held:

'* * * Where witness for the prosecution falsely testified that there was

no agreement that he was to receive lenient treatment for testifying against defendant, Assistant District Attorney should have exposed the lie of the witness, and failure to do so constituted error so fundamental and substantial that verdict of guilty would not be permitted to stand, even though proof of defendant's guilt may have been convincing.'

And in the body of the opinion the Court said:

'Where a promise of leniency or other consideration is held out to a self-confessed criminal accomplice for his co-operation, there is grave danger that, if he be weak or unscrupulous, he will not hesitate to incriminate others to further his own self-interest. Long experience in granting leniency to "co-operative accomplices has undoubtedly shown the hazards in the practice to be more than offset by benefit to society in the detection and punishment of crime. It requires no extended discussion, however, to establish that the existence of such a promise might be a strong factor in the minds of the jurors in assessing the witness' credibility and in evaluating the worth of his testimony. The failure to disclose an "understanding" or a promise cannot but seriously impair the jury's ability to pass upon this vital issue, and that is precisely the infirmity under which the jurors labored in the case before us.'

It was pointed out that while the trial judge by interrogation elicited some vague answers which might have induced the jury to believe that Mantzinos was 'hoping' for leniency, and his charge to the jury indicated the judge's own belief that the witness entertained such hope, the appellate court said:

'But that is a far cry from positive knowledge that Mantinos had actually been assured consideration in return for continued co-operation and that he had deliberately lied about the matter on the stand.' "

Clearly the instant case is distinguishable from the cases of Hurt and Savvides, supra. In Hurt v. State, in a hearing coram nobis, petitioner sought to establish that witness for the prosecution had been promised leniency to testify against Hurt, but had denied this promise of leniency when questioned about it before the jury. In the coram nobis hearing, the three-Judge Court before whom the hearing was conducted, determined that although the evidence was conflicting, no promise of leniency had been made by the prosecuting authorities and therefore the rule enunciated in People v. Savvides, supra, had no application.

In the Savvides case in the trial before the jury, the prosecuting witness denied having been granted immunity or promised leniency and the prosecuting authorities knowing that this statement was false, remained silent and did not disclose its falsity to the court or defense counsel, nor was it called to the attention of the jury.

In the instant case it affirmatively appears that counsel for defendant was present when immunity was granted to Ishmael. The witness, Ishmael, was carefully cross-examined concerning the circumstances under which immunity was originally granted. The principal contention of the defendant is that witness, Ishmael, lied when he stated that he had never appeared before Judge W. R. Wallace and was granted immunity prior to testifying at the preliminary hearing. Defendant relies upon the statement made by Ishmael's counsel in Chambers that:

"I want the record to show that on or about the 30th day of July, 1965, an offer of immunity given by Curtis Harris, which offer was accepted on that day by Johnny Ishmael also on that date this matter was taken up with Judge W. R. Wallace then District Judge of Oklahoma City who approved the offer of immunity."

It is clear from the testimony of Ishmael that he was never taken before Judge Wallace and indeed the statement of counsel in Chambers does not purport to state that he was taken before Judge W. R. Wallace, but rather that the matter was taken up with him. It is likewise clear that from the testimony of Ishmael that the negotiations relative to immunity were made between his counsel and Mr. Curtis P. Harris. All of this was called to the jury's attention in cross-examination by Mr. Berry and re-direct examination by Mr. Harris of the witness, Ishmael, on the trial before the jury. Counsel for defense had every opportunity to call this to the attention of the jury and the court properly instructed the jury.

Under these circumstances, we are of the opinion that this assignment of error is wholly without merit.

The last witness called by the State in chief was Cordell Calvin ("Corky") Brown, a part of whose testimony it is now urged was inadmissible as part of the res gestae and hearsay. His testimony in substance was that about 12:00 o'clock on the evening of July 7, 1965, he was washing his car on North Western in Oklahoma City, next to the drive-in called the Split-T, when he noticed a girl running toward him. As she came toward him she was sobbing and asked him his name and if he would take her home. He told her that he wanted to finish his car and then he would take her home. He stated that as he would walk around the car, wiping it off, she would get to the opposite side, or back up. Her face was swollen, her clothes were wrinkled and she was crying quite heavily. They had little conversation on the way to her home, he lit her a cigarette and she seemed to calm down some, but continued to cry. As they approached the home, there were cars in front of the house and she asked him to hurry and started sobbing again. As she got from the car and ran in front of his headlights, he could see her back side for the first time and the back of her shorts had a spot of blood from a couple of inches below her waist running to the crotch of her shorts. He stated that some boy whom he did not know walked up to him and said, "Did she say anything about being raped?" to which he replied, "No." Then a man leaned in the window and asked if he knew where Bill went. He replied that he did not know any Bill, and knew nothing about all this, but just brought the girl home. This man was identified in court as being Mr. David Shapard, father of John William Shapard.

On cross-examination by Mr. Berry, Corky Brown testified that he had refused to talk to defense counsel until he could obtain a copy of his statement given to the County Attorney's office. This was never done. Mr. Berry elicited practically the same information from Mr. Brown, as to the events that happened that night, as was brought out by the prosecuting authorities.

Most of the testimony of witness Brown related to the physical condition and appearance of the prosecutrix when she came to the carwash where he was washing his car. The testimony of the prosecutrix was that she ran over to the carwash after being released from the car of her assailants, which would cover only a matter of seconds. This would, under many of the authorities, be sufficient to bring it within the res gestae, but since the prosecutrix did not make any detailed statement to the witness concerning the crime, it is unnecessary here to consider: suffice it to say that:

> "One to whom complaint has been made may also testify to the making of the complaint by the prosecutrix, her condition and appearance at the time the complaint was made, but may not be permitted to testify to statements made by the prosecutrix as to the details of the outrage as reported to the witness."

See Coppage v. State, 76 Okl.Cr. 428, 137 P.2d 797.

In the instant case this is all that was testified to by the witness, save and except the statement that a young man had inquired at the residence of the prosecutrix whether she had said anything about be-

ing raped and the question asked of witness Brown by the defendant's father if he knew where Bill was. Neither of these questions were specifically objected to except that after testimony of the witness that a young man had asked witness Brown if she had said anything about being raped and Brown had answered that she had not said anything, and Brown had testified in response to a question if he knew who the boy was and that he did not, counsel for defense interposed the following:

"MR. BILL BERRY: This still is going in under the res gestae, this boy coming up and asking this?

THE COURT: Yes.

MR. BILL BERRY: Note our objection."

 Counsel did not properly preserve this question for review on appeal. He should have objected to the statements now complained of at the time they were testified to by the witness and requested that the jury be admonished to disregard them. However, had proper objection been interposed to these statements and preserved for consideration on appeal, their admission into evidence would not have constituted reversible error, for they did not purport to give details of the alleged rape.

We reiterate, none of the statements made by the prosecutrix to this witness purported to relate any details of the alleged assault, and even assuming them to be hearsay, their admission could only be considered as harmless error.

The State then rested, and prior to the introduction of any testimony on behalf of the defendant, the trial court in an in-chambers discussion with the respective parties, determined that he would admit evidence of the general reputation of the prosecutrix for lack of chastity, but exclude specific acts. This is reflected in the Casemade, Vol. III, page 629.

 We observe that the rule relating to when evidence of this character may be introduced, is not well settled in this jurisdiction and that the court's de-

termination to admit general reputation and exclude specific acts was an effort on his behalf to adopt a rule most favorable to the accused in order to assure him a fair trial. However, since considerable confusion exists, we deem it necessary to set forth the rules to be followed in all future cases wherein an accused is charged with forcible rape, either in the first or second degree and the rule which should have been followed in the instant case. We have examined many authorities bearing on this issue and are of the opinion that in a prosecution for forcible rape where the undisputed evidence establishes that sexual intercourse was accomplished with the prosecutrix by force or fear overcoming her resistance, and where neither the evidence offered on behalf of the State, nor the evidence offered on behalf of the defendant, tends to any substantial degree to raise the issue of consent, neither the evidence of the general reputation of the prosecutrix for unchastity, nor specific acts of sexual intercourse between the prosecutrix and others, are admissible. In the event that the evidence on behalf of the prosecution or of the defense, raises the issue of consent, then evidence of the general reputation of the prosecutrix for unchastity is admissible, but not specific acts of sexual intercourse unless such acts were with the accused.

 We are of the further opinion that when the evidence adduced on the trial tends to establish that the prosecutrix is pregnant, then in that event, evidence of specific acts of sexual intercourse between the prosecutrix and persons other than the accused, occurring near the time of conception, are admissible as tending to show that the pregnancy resulted from sexual connection with persons other than the accused and this evidence is admissible without regard to whether the charge be forcible or statutory rape.

The oft-stated justification for the rule which permits the admission of testimony relating either to the general reputation of the prosecutrix for unchastity, or evidence

of specific acts of sexual intercourse of the prosecutrix with others, is based upon the underlying principal that it is more probable that an unchaste woman would assent to such an act than a virtuous woman. It does not, however, logically follow that the admission of this characer of evidence would tend to prove or disprove any issue in the case where the conduct of the parties is before the jury and everything excludes the idea of consent.

After making his opening statement, the defendant called his first witness, Daniel Webster, a reporter for the *Oklahoma Journal*. Mr. Webster testified, in substance, that he had attended the arraignment on July 8, 1965, where he talked to Johnny Ishmael and Larry Wyatt Smith; that at that time they were laughing and cutting up and although they had been advised not to talk to reporters, Mr. Webster stated:

> "They said they had not been present at any time during this rape. They saw something was going to happen and they decided to leave and they took a walk. They didn't know anything about it and they didn't know anything of any crime."

On cross-examination, this witness testified that two or three days subsequent to the arraignment, accompanied by Mr. W. P. "Bill" Atkinson, publisher of the *Oklahoma Journal*, he went to the home of Mr. David Shapard, where he had a lengthy conversation with Mr. Shapard. He further testified when asked if he had been directed by Mr. Atkinson to write stories favorable to Mr. Shapard, as follows:

> "A. I can't answer that in a yes or no.
>
> Mr. Atkinson said that he was a particular friend of Mr. Shapard and was certain that Mr. Shapard must have a side of it that hadn't come out and asked me to please get in contact with Mr. Shapard and write a story that would show from Mr. Shapard's standpoint of what had happened.
>
> He said that we prided ourselves on having a newspaper that told both sides and so far all that had appeared made it appear that Mr. Shapard took his son from the police station and he wanted to give him an opportunity to set the record straight as to what actually happened."

This witness further testified that Mr. Atkinson had informed him that the father of co-defendant Fellers was an especial friend of his, but that he had not been directed to write anything concerning Fellers.

The next witness called for the defense was Rolland Eugene Schmidt, who testified that he was nineteen years old, a former employee of T. G. & Y. and currently in the armed forces. He stated that at 1:00 o'clock in the morning of July 3, 1965, he and one Tommy Smith were driving down Western where they saw the prosecutrix and her cousin. They stopped and talked to the girls and after Smith had established friends in common with the prosecutrix's cousin, the girls indicated they would like something to drink. The girls got in the back seat of the car, and they went after beer. At the place where the beer was purchased, Schmidt got in the back seat with the prosecutrix and her cousin got in the front seat with Smith. They drove to a wooded area near Lake Hefner, where the witness testified:

> "I sat back in a corner in the back seat and I drank my beer, and she laid across my lap and she got to—no one in the front seat could see what was going on, being done."

At this point, outside the presence of the jury and in the court's chambers, the witness was instructed by his attorney, Mr. Marrs, not to answer any questions on the grounds that it might tend to incriminate him. In the presence of the jury the witness Schmidt was recalled to the witness stand where the following appears in the record:

> "BY MR. BILL BERRY: (Continuing)
> Q. I will ask you whether or not Mr. Schmidt, that you had sexual intercourse with Sherri Marie Noble at this particular time and place?
> A. My lawyer advises me not to answer the question. It might tend to incriminate me.

MR. MOORE: The State of Oklahoma asks that this witness be held in contempt of Court, Your Honor.

MR. BILL BERRY: We would at this time ask the Court to grant immunity to this particular witness for the same reasons that immunity has been granted to Johnny Ishmael.

THE COURT: All right, just a minute.

Ladies, and gentlemen, the Court will recess for five minutes. I would like to confer with counsel in chambers.

Please remember the earlier instructions I have given you.

(THEREUPON, the Court recessed and the people were leaving the Court room, when the following transpired).

MR. BILL BERRY: Just a minute. Just a minute, Your Honor.

In the presence of the Jury panel, Sam Moore just said openly that this boy is a plant and we know it.

He just said it openly and in front of two Jurors, they heard it and they both were looking at you and looking at me right after you said it.

THE COURT: Please remember the earlier instructions that I have given you.

(THEREUPON, The Court recessed at 2:40 p. m.)

(THEREUPON, the following transpired in chambers.)

THE COURT: The press will be excluded from the chamber hearing. All right, Mr. Berry.

MR. BILL BERRY: Comes now the Defendant John William Shapard and moves the Court to enter a mistrial in this case for the reason that the counsel for the State, standing within three feet of the Jury box when the Judge admonished counsel to come into chambers, says, 'This boy is a plant and we know it.' This was in the presence of the Jury.

It is highly prejudicial. There is no way in the world to remove this from the minds of these Jurors, and it is obviously just impossible for us to proceed in any

way, shape or form to get a fair trial in these proceedings.

MR. MOORE: Let the record also show on behalf of the State, the statement was made by me in the Court room, that I did not speak loudly enough even for Mr. Harris, who was behind me which was the direction that the Jury was from me, to hear me; and that I said it under my breath.

Let the record show that the Court Reporter didn't hear it and the Court didn't here it.

MR. BILL BERRY: You were standing in front of Mr. Kickingbird and another juror, and a few feet to the right of them, and both looked at me and then at him, just like that. (Indicating)

MR. MOORE: Let the record further show that inasmuch as the counsel for defense called it to the obvious attention of the Jury not knowing if they had heard it, that he caused it to be to the attention of the Jury.

Further that he loudly objected to the Jury and repeated what he said that I said. I don't deny that he heard it, but I don't think that the Jury heard it.

THE COURT: Motion is overruled.

MR. BILL BERRY: Exceptions.

THE COURT: That is for the mistrial.'"

The defendant urges that the Assistant County Attorney, Mr. Sam Moore, committed reversible error by making prejudicial remarks in the presence of the jury.

 We cannot condone the conduct of the Assistant County Attorney in making this statement in the courtroom during the trial, whether it could be heard by the jury or not, but since no evidence was presented in support of defendant's contention that at least two jurors heard the comment, either at the time the court considered said objection in chambers or on the motion for new trial, we have nothing before us except conflicting statements of defense counsel and the Assistant County Attorney Moore. However, since Schmidt's testimony was offered for the sole purpose of

attempting to establish a specific act of sexual intercourse with the prosecutrix, and was incompetent and inadmissible, his refusal to testify on this issue created an inference to the jury which was prejudicial to the State and should have been excluded. Under such circumstances we fail to see how, even if the jurors had heard the prosecutor's remarks, the defendant was injured thereby, for he benefited more from this incompetent evidence than he was injured by the remarks.

Defendant now urges:

"At the time of trial, the Defendant made a request that the County Attorney grant defense witness Gene Schmidt immunity so that he could testify to certain matters which would have enlightened the court and the jury as to the truth and the facts of the case at bar. When the request was made the County Attorney stated:

'We are not going to grant any man immunity to lie.' (C–M., Vol. III, page 664).

While it is not incumbent upon the County Attorney to grant immunity to the Defendant's witnesses, it is not an unreasonable request in the light that immunity had been granted the State's witness, Johnny Ishmael. The granting of immunity is a tool to aid in seeking the truth as to the merits in each case and is not merely to be used as an instrument to fortify the State's case and to be issued at the prosecutor's whim. As stated in Mooney v. Holohan, 294 U.S. 103 [55 S. Ct. 340], 79 L.Ed. 791:

'A prosecution that withholds evidence on demand of an accused which, if made available would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant, that casts the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice.' "

■ We are of the opinion that this assignment of error is without merit, for in Pate v. State, Okl.Cr., 429 P.2d 542, we held

that immunity could be granted only when a charge is pending against an accused and the witness to whom immunity is granted has evidence tending to establish the guilt of the accused. Here it can be seen that the County Attorney was without authority to grant immunity.

Tommy Smith was next called as a witness by the defense and his testimony was substantially the same as that given by witness Schmidt. He testified that he was 19 years of age and was going into the army and presently unemployed; that the prosecutrix consumed a quantity of beer on the evening of July 3, 1965, and appeared to him to be "tight." He further stated that on two occasions the prosecutrix and Schmidt left the car together and that he remained in the car with the prosecutrix's cousin.

This testimony is objectionable for the same reason as the testimony of Schmidt and similar testimony should be excluded in all future cases involving these same circumstances.

The defense next called Gayle Ann Garis, a 16 year old neighbor of the prosecutrix's cousin, who testified that she had known the prosecutrix for a number of years; that she knew and had gone to school with the defendant; and that on July 3, 1965, she had a conversation with the prosecutrix who looked tired. When the prosecutrix was questioned about her appearance she testified that at 1:00 a. m. the previous evening she and her cousin had gone to the lake with two boys, driving a Mustang, and that they had drunk a lot of beer and had "fun"; that one of the boys had a blanket with him and that the prosecutrix then unsnapped her blue jeans revealing her abdomen which had blue marks on it. The prosecutrix did not tell her who gave her the "hickeys." This witness further testified that she was present at the residence where the prosecutrix was staying at about 1:00 or 1:10 on the morning of July 7, 1965, when prosecutrix arrived in a blue car and that she observed a blood

stain on the prosecutrix's shorts which the prosecutrix described as menstrual blood.

■ The portion of this witness' testimony relative to the statements made by the prosecutrix to her on July 3, 1965, should not have been admitted and similar testimony should be excluded in all future cases; however, the testimony relating to the prosecutrix's appearance on July 7, 1965, was competent.

We will here consider the defendant's assignment of error that the prosecuting authorities committed reversible error in that out-of-state witnesses were picked up by the San Antonio police, held in jail and statements taken from them and later photographed by the police photographer at the deposition hearing, and that some of said witnesses were advised that if they testified they might be subjected to statutory rape charges and could receive the death penalty.

■ The evidence bearing on this issue is that when the prosecuting authorities became familiar with the names of the witnesses whose depositions were to be taken in San Antonio, they contacted the San Antonio authorities and requested that these witnesses be interviewed and statements secured from them. This is precisely what the San Antonio authorities did. While it does appear that some of the witnesses, who were police characters, were cooperative with the San Antonio authorities only because of their prior contact with them, it does not appear from the evidence that the police authorities, prior to securing these statements, ever threatened the witnesses with electrocution if they admitted having had sexual intercourse with the prosecutrix at a time when such act constituted statutory rape.

Defendant seeks to support this contention by newspaper clippings and statements of his counsel made to the court. The proper method of establishing this alleged error would have been to question the deponents as to whether they had been coerced or intimidated and threatened with the electric chair.

Had the San Antonio authorities advised them that if in their statements, under oath, they admitted having had sexual intercourse with a 13 or 14 year old girl, the same could have been used against them on a statutory rape prosecution in Texas, the authorities would have been correct in so doing.

The further fact that a police photographer took pictures of the deponents at the place where the depositions were made, does not constitute harassment. Moreover, we observe that most of the witnesses were unaware that the photographer was an employee of the Police Department. Such a procedure was undoubtedly followed for the purpose of allowing the prosecutrix to view her accusers, who were not present at the trial.

We are of the opinion that this assignment of error is wholly without merit.

The first deposition offered by the defense was that of Mother Leone. The only testimony offered from the deposition of Mother Leone was that she was the principal of the high school in San Antonio where the prosecutrix went to school for one year 1964–1965. On page 743 of the Case-made the following appears:

"BY MR. FELLERS: Do you know about her reputation as to whether it would be good or bad for truthfulness?

MR. MOORE: Objection.

A. Well, in general, I should think that it would be more on the untruthful side."

On cross-examination by Mr. Moore the following appears on page 749:

"Q. Well, you don't know even to this day that Sherri Noble had ever been in trouble?

A. No, I don't.

Q. So, I assume that when she was admitted to your academy that she had, insofar as you were able to ascertain, a good reputation?

A. Yes, I assumed that she did. Yes."

The next deposition was that of Michael John Sawyer who at the time of trial was a 19 year old male who knew the prosecu-

trix in 1963. After testifying that he had seen the prosecutrix during the year 1963 in the company of women at the home of C. A. Hassell, 914 Lovett Avenue, San Antonio, Texas, one of whom he described as a prostitute, the following portion of his deposition appears in the Case-made, Vol. III, at page 755, when being questioned on direct examination by the defense:

"Q. Do you know what the word chastity means?

A. Yes, sir.

Q. What?

A. Virgin, I guess.

Q. What was her reputation for chastity?

A. She was known as an easy piece, if you wanted some."

The defendant now objects to the cross-examination of Michael John Sawyer, the same appearing in the record at Case-made, Vol. II, pages 790–792. On Page 789 of the Case-made, Vol. III, the following appears in the record:

"(THEREUPON, Mr. Sam Moore continued reading Michael John Sawyer's deposition to the Jury on page 39, line 18, as follows:)"

The in-chambers ruling of the court appear in the Case-made, Vol. III, at pages 604 through 618. On page 615, we find the following:

"MR. HOWARD BERRY: Objection to all of Page 39.

THE COURT: Not lines 1 through 6.

MR. HOWARD BERRY: Yeah, about him getting a new car. I don't think that has anything to do with it.

MR. MOORE: He volunteered that.

MR. HOWARD BERRY: I am going to object to that as not being responsive to the question.

THE COURT: Objection is sustained to Line 7 through 17 on Page 39.

MR. MOORE: This question about pertaining to the police.

MR. HOWARD BERRY: Who is prosecuting the police?

MR. MOORE: Yes, I think they are.

MR. HOWARD BERRY: I agree to it but I don't think—

MR. MOORE: That does refer to one specific cop.

THE COURT: The rest of Page 39 is in from Lines 18 through 25. What about Page 40.

MR. HOWARD BERRY: I don't object to any of Page 40.

THE COURT: Page 40 is in, now Page 41.

MR. HOWARD BERRY: Page 41, I don't object to it.

THE COURT: All right, forty-one is in.

MR. HOWARD BERRY: Forty-two, I don't object to it and no objection to Page 43. * * *."

We observe that the cross-examination admitted began on Line 18 of Page 39, and while the deposition of Sawyer does not appear in its entirety anywhere in the record, the testimony of which defendant now complains, assuming the deposition to have been taken by a certified court reporter in the manner in which transcripts and depositions are usually taken, could not have appeared on page 39 of the deposition, but rather on page 40, 41, or 42 of the deposition, none of which were objected to by the defendant either in chambers or in open court.

It thus appears that neither an objection was taken to the testimony now complained of, nor was an exception taken to the ruling of the court.

Thereafter, defendant offered portions of the testimony of Kenneth D. Young's deposition. Mr. Young testified that he was principal of Dwight Avenue Elementary School in San Antonio, where the prosecutrix was a student in 1963. During that time he stated that she was good enough to work as an office assistant and he set forth her duties. He further testified that she associated with Collins Wade Huseman,

Dean Soey, Roger North and David Sawyer.

The next deposition was that of Roger Dean North who, at the time of trial was a 17 year old male, and testified that he knew the prosecutrix in the seventh grade, and dated her for five or six months. When asked by defense counsel as to the reputation of the prosecutrix, he stated that she was a "whore."

Counsel for the defendant now urges that the prosecuting attorney was allowed to make an improper cross-examination of Roger D. North and specifically objects to the testimony appearing at Page 855, Vol. IV of the Case-made:

"BY MR. MOORE:

Q. Now, what is your name?

A. Rodger North.

Q. Do you have any other name?

A. No, sir.

Q. Do you have any brothers?

A. Yes, sir.

Q. James Vernon North your brother?

A. Timmy North?

Q. James.

A. Jimmy North—James—

Q. Jimmy Vernon North.

A. Yes, sir.

Q. Known as Jimmy V. North?

A. Yes, sir.

MR. MOORE: Line 12, Page 31.

Q. I see. He has been charged with rape in San Antonio?

A. Yes, sir.

Q. He has been charged with homicide in San Antonio?

A. Homicide?

Q. Murder, killing somebody?

A. No, I don't think so.

Q. Was he charged with safe burglary in California?

A. Yes, sir.

Q. Was he convicted on those charges?

A. Convicted, you mean—

Q. Did he go to jail?

A. You mean proven guilty?

Q. Yes.

A. He was proven guilty, but they put him on probation, I think."

Counsel's contention that this testimony was duly and properly objected to with exceptions taken by the Court is not supported by the record, for on page 585, Vol. III, of the Case-made, in the in-chambers editing of the deposition of North, the following proceedings occurred:

"MR. MOORE: I would say to the Court the probability of homicide and murder and safe burglary should be shut out.

MR. HOWARD BERRY: Your generosity makes me think there is an ulterior motive.

THE COURT: Page 31 (Question) "Has he been charged with rape in—" and the question on Line 6 of the same page—

MR. MOORE: I see the question if the defense doesn't object to it.

MR. HOWARD BERRY: I think we ought to let all of that go in on that page.

THE COURT: All right, page 31 is in."

■ It thus appears that neither an objection was taken to the testimony now complained of, nor was an exception taken to the ruling of the court, and we are of the opinion that this assignment of error is completely without merit.

The next deposition was that of Larry Click who, at the time of trial, was a 21 year old private in the Army. He became acquainted with the prosecutrix in the Fall of 1964. It is pertinent that he testified that he had seen her at the C. A. Hassell house and present at that time were David Sawyer, Mike Cullard, a girl called Frency, another girl named Joane, and several people he did not know. When asked what the prosecutrix's reputation was for truth and veracity, Click testified, "Well, she has been caught in some lies, and it makes it bad."

607

Defendant now complains of cross-examination of Larry Click in Case-made, Vol. IV, pages 883 and 884. This testimony was read from the deposition beginning on page 24, line 3, and continuing thereafter. In the in-chamber proceedings, the following appears in the Case-made, Vol. IV, page 844, with reference to the deposition of Click:

"THE COURT: All right on Page 24, Lines 1 and 2.

MR. FUNK: I don't see anything wrong with the rest of it.

THE COURT: All right. Page 25.

MR. HOWARD BERRY: I don't have any objections to anything more.

THE COURT: Lines 4 through 17 will be eliminated on Page 26.

(THEREUPON, The Chambers hearing adjourned * * *.)"

It is readily apparent from the record that no objection was interposed to the admission of this cross-examination and we hold this assignment also without merit.

The next deposition was that of Donald Nelson Hulme who, at the time of trial, was 22 years old and he testified that he met the prosecutrix right after he got out of the penitentiary in 1964. When he first met her she was with the Sawyer boys, David and Michael and that she was drinking. He further stated she "seemed like a pretty nice girl then, the very first time I met her."

On direct examination of Donald Hulme by defense counsel, the following appears in the record:

"Q. Now, in addition to yourself, what other people in this group have a criminal record that you know of?

A. Larry Click, Albert Valadez, David Sawyer, Joey and Butch Parker, C. A. Hassal, Mike Cullard.

Q. Are you acquainted with the reputation of Sherri Marie Noble for her virginity prior to July 7, 1965?

A. No, sir.

Q. Well, did she have a reputation whether she was a virgin or not?

A. Well, no, sir, not as a virgin, she didn't.

Q. Did she have a reputation?

A. Yes, sir.

Q. All right. Now, what was that reputation?

A. The other girls called her a pig, slut, and the boys called her a whore."

The defendant now urges that the prosecution committed reversible error in introducing the testimony, appearing in the Case-made, Vol. IV, at pages 883 and 884, the same being cross-examination of Mr. Hulme. The in-chambers ruling of the court appear in the Case-made, Vol. IV, at pages 825 through 838, and although we have carefully searched the record to ascertain where an objection was interposed to the testimony now complained of, we are unable to find that specific objection with reference to this testimony. Under such circumstances it presents no question reviewable on appeal.

The next deposition was that of Shirley Fuqua who testified that she was a doctor's wife in San Antonio, was the mother of five children, and when the prosecutrix moved in her neighborhood she was about 13. Mrs. Fuqua became a good friend of Marty (the prosecutrix's mother) and quite often visited in their home up until about six months prior to the time the deposition was taken. She stated that their friendship split over Marty's taking a job in which she flew away during the week, and on a couple of weekends. Marty paid her to drive her husband to work and pick up the prosecutrix at school until one week-end she came back with about $3,500 worth of clothes, one dress being worth $500.00. Mrs. Fuqua stated that she contacted her aunt who told her to have nothing further to do with Marty, which advice she followed.

She further testified that the prosecutrix was her baby sitter at one time and that she did not think it was fair to her to babysit,

as she wanted to go skating. She testified that the prosecutrix did not have a reputation for telling the truth and her reputation in the neighborhood in the community was bad.

This concluded the evidence offered on behalf of defense and thereafter the State called for rebuttal witnesses. They were the prosecutrix, her 17 year old cousin, a police officer from San Antonio, Texas, and Raymond Joe Lucas. We deem it unnecessary to set forth the testimony of these witnesses on rebuttal except to observe that the testimony of the prosecutrix, her cousin and Lucas was introduced to refute certain evidence offered on behalf of defense, and Officer Castillion of San Antonio testified as to the good reputation of the prosecutrix.

Thereafter, the Court instructed the jury, refusing as he did so to give the State's requested instruction No. 3, and defendant's requested instruction No. 20. Defendant now contends that the trial court erred in refusing to give defendant's requested instruction No. 20, that:

> "You are instructed that in weighing the testimony and arriving at your verdict, you must not be influenced by questions of public interest or policy, newspaper editorials, radio reports and editorials, television reports and editorials, the effect of your verdict upon other persons charged with crime and whether the verdict would or would not be pleasing to the Judge, or any other consideration outside of the evidence in this case."

In this connection we observe that the instructions by the trial court that the jury should disregard prejudicial publicity and any pre-existing bias or prejudice have been referred to as sufficient to insulate the trial from hostile sentiment or prejudice relied upon by the accused in his motion for continuance. Hart v. United States (5 Cir. 1940 La.) 112 F.2d 128; Shushan v. United States (5 Cir. 1941) 117 F.2d 110, 133 A.L.R. 1040; Honda v. People, 111 Colo. 279, 141 P.2d 178; Rogers v. State, 37 Ala.App. 8, 65 So.2d 525.

From a reading of the record during the empanelment of the jury, it is seen that the trial judge gave the standard admonition to the jury several times (C–M, Vol. I, pages 31, 80, 127, 189, 256, 316, 326). In particular, some examples of the admonitions of the trial judge are as follows:

C–M, Vol. I, p. 80:

"* * * don't read anything about the case, hear anything about the case, see anything about the case, I am talking about the possibility of an article in the newspaper or a story on the radio or television."

C–M, Vol. I, p. 128:

"Do not read any articles about the case, past or present; if you come across any articles in the press or any radio or television reports turn the page of the paper or the channel of the radio station or television station."

C–M, Vol. I, p. 189:

"Do not read, listen or see any newspaper news media or anything about this case."

We are of the opinion the judge's instructions and admonitions throughout the course of the trial were ample to insulate the jury against any hostile sentiment or prejudice and the granting of defendant's requested instruction would have been unnecessary repetition.

It is also contended that:

"An additional reversible error in the instructions was in the failure of the court to require the State to elect as to which of two alleged offenses of rape the Defendant was being tried on, or, in the alternative, the court erred in not instructing the jury that it should treat the first offense on which proof was presented as the offense upon which a conviction was sought.

* * * * * *

Clearly the testimony in this case indicated that there were two alleged acts of sexual intercourse. The court failed in its instructions to tell the jury which one of the two alleged offenses was the of-

fense upon which the Defendant was to be tried.

This error occurred in spite of the fact that in the State's Requested Instruction No. 3 the State specifically asked the court to instruct the jury as follows (C–M., Vol. V, page 1105):

> '* * * and in that connection you are instructed that the evidence offered which tends to prove the first acts of sexual intercourse by the Defendant, John William Shapard, with the prosecutrix, Sherri Noble, is the evidence upon which the charge of rape in the second degree is founded in this case.'

The court refused to give that instruction and instead gave the following instruction (C–M., Vol. V, page 1099):

> 'Other evidence, if any, which tends to prove the commission of more than one rape, if any, of a prosecutrix and of more than one crime, if any, by a defendant is admissible and proper for consideration by the Jury to show (1) motive of the defendant, (2) intent of the defendant, (3) absence of mistake or accident on the part of the defendant, (4) identity of the person charged with the commission of the crime for which the defendant is put to trial, and (5) common scheme of plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other.'

Instruction No. 8 [sic] would have been proper, for the cases very clearly hold that when the State offers proof of more than one act of sexual intercourse between the prosecutrix and defendant and no election is made by the State as to which act it relies upon for conviction, it then becomes the duty of the trial court, *on its own motion,* to require the State to elect upon which specific act the State relies for conviction or to treat the first act as having been elected *and instruct the jury* to limit its consideration to such act and consider other acts as corroboration.

[redacted]

Cases holding this are Cody v. State [Okl. Cr.App.], 361 P.2d 307; Dugan v. State [Okl.Cr.App.], 360 P.2d 833; Cooper v. State, 31 Okl.Cr. 217, 238 Pac. 503; Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160 and Kilpatrick v. State, 71 Okl.Cr. 129, 109 P.2d 516."

The State's brief on this issue, prepared by Assistant Attorney General, Mr. Penn Lerblance, sets forth the law so concisely on this point that we here adopt it in its entirety:

> "The State urges that there was no error in the failure to elect which act of intercourse since there was but one transaction on which the charge was based. The record shows one continuous forcible act of rape although there was more than one penetration.
>
> CM, Vol, p. 410:
>
> 'A. (By Witness)
>
> And so, they put me in the back seat and Bill Shapard started taking off his clothes and I kept fighting so they held my legs and my arms and they kept telling me to quit screaming that I was going to wake up the night watchman, and then, Bill Shapard climbed on and he started, he started getting his satisfaction and then after him, the other boys climbed on.
>
> Q. (By Harris)
>
> Sherri, while Bill Shapard was on you, were any of the other boys holding you?
>
> A. (By Witness)
>
> Yes, sir.'
>
> CM,Vol. V, p. 412:
>
> 'THE WITNESS:
>
> Let's see, there was Bill, and then Larry Smith, and then from then it was only by their faces that I could tell, I think that it was one of the Stanley twins, and then Paul Brogan, and then David Fellers, and then Bill Shapard again.'
>
> Each of the cases cited by the defendant in support of his argument is distinguishable since in each of these cases there was a time interval between the acts of inter-

course. In the cases cited by defendant there were in fact separate and distinct offenses.

Cody v. State, Okl.Cr., 361 P.2d 307, cited by defendant is distinguishable from the case at bar where the Court found that,

'Her (prosecutrix) testimony discloses that the first act was committed in the early part of the evening. She stated that she and defendant left McKelly's apartment and visited numerous other places. Later they returned to McKelly's apartment where another act of sexual intercourse was accomplished.'

In Dugan v. State, Okl.Cr., 360 P.2d 833, the Oklahoma Court of Criminal Appeals held the trial court's instruction that the exact date of the occurrence was immaterial, was in error where the proof showed eight different acts of intercourse or occurrences separated by a time interval.

Cooper v. State, 31 Okl.Cr. 217, 238 P. 503, is also distinguishable:

'He (defendant) then took the prosecutrix to a cafe where he worked, where they had supper together, and on returning to the hotel took her by the back stairs to his room, where an act of sexual intercourse was accomplished. They then called on some friends of his in the town, and later returned to the hotel, and two or three acts of sexual intercourse were accomplished in a room on the first floor. Some time during the night the prosecutrix returned by train to Guymon. After that the defendant met her on one or two occasions, when acts of intercourse took place.'

Kilpatrick, 71 Okl.Dr. [Cr.] 129, 109 P.2d 516, is also distinguishable:

'Even though both of the offenses testified to in this case were committed the same night, they were separate and distinct offenses; * * *.'

In Kilpatrick, supra, two acts occurred within a four-hour period and the defendant admitted one act while denying actual intercourse at the time of the first alleged act.

Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160, also involved clearly separate acts:

'* * * her (prosecutrix) stepfather (defendant) took her into the bedroom and placed her on the bed and got on top of her and placed his private parts in hers * * * that on the night of this day * * * defendant "did the same thing that night," and that the next morning "he did the same thing" and again that night "did the same thing", * * * but about one week later in the woods "he did the same thing", thus making five separate acts.'

In McManus et al v. State, 50 Okl.Cr. 354, 356; 297 P. 830, where a rape conviction was affirmed, the six defendants 'held her and each defendant had sexual intercourse with her, two of them twice.' In that case the Oklahoma Court of Criminal Appeals cited and affirmed the rule which defendant now urges but held that it was not applicable in that factual situation.

The State submits that the rule requiring an election between the acts of intercourse is likewise not applicable in the case at bar for the same reasons as explained in McManus v. State, supra:

'But in cases of rape by force where two or more persons at the same time and place and as a part of the same common design and purpose, acting together in a continuous transaction, ravish a female, the two or more parties each having sexual intercourse, the rule stated has no application. In the case now under consideration, force is an essential ingredient, and the evidence is that each of the defendants was present during the several acts of intercourse, assisted in the actual perpetration of the crime by holding the prosecutrix and otherwise aiding and abetting. *There was one continuous application of force, and while there was penetration by each of the defendants, it was in fact a single continuous transaction.* If any particular interval of time intervenes between

the separate acts, or if they occur under such circumstances that there might be a basis for a jury to believe that one or more of the acts were committed and a reasonable doubt might exist as to the others, there must be an election. But where all the evidence tending to prove the crime is that it was a continuous act and application of force, and there is no basis in the evidence for a belief or a reasonable doubt that a part of the transaction occurred and a part did not occur, nor that one or more of the accused may be guilty and the others not, then there is but one crime, one continuous act, and there need be no election. In the instant case, all the evidence as to the actual offense is that the prosecutrix was thrown on the ground and was not permitted to rise until all the defendants had had sexual intercourse with her, and that all such acts by all the defendants were pursuant to a common purpose, intent, design, and conspiracy and by an acting together of defendants in a continuous application of force. There is no basis in the evidence under which the jury could believe or entertain a reasonable doubt that a part of the transaction occurred and a part did not occur.' (Emphasis supplied.)

Therefore, the State submits that there was no reversible error in the trial below for the reason that the court did not instruct the jury to consider only one act of intercourse committed by the defendant. While there was proof of more than one penetration there was in fact a single continuous transaction. Furthermore, defendant has failed to show how he was prejudiced by this assignment of error."

We are of the opinion and therefore hold that under the authority of McManus et al v. State, supra, that this assignment of error is without merit.

After instructing the jury, Judge Smith made the following announcement:

"THE COURT: You will now listen to the argument of counsel which is a proper part of this trial. Counsel for the State has thirty minutes to make an opening statement and counsel for defense has an hour to make their argument and then counsel for the State follows."

Thereafter, the State concluded the opening portion of its closing argument and counsel for defense began his closing argument which, after eight pages in the Case-made, was interrupted by the Court. After the recess and in open court, the following proceedings appear in the Case-made:

"(THEREUPON, the Court resumed at 2:00 o'clock P.M.)

THE COURT: Members of the Jury, I regret having a recess in the middle of the argument. We have to take into consideration the Court Reporter who is taking the argument down and that is the only reason I declared the recess. I am not going to hold Mr. Berry to our hour originally agreed upon for that reason.

You may proceed.

MR. BILL BERRY: Your Honor, I am sorry if I made any outburst. I don't know if I did or not. I might have said something I shouldn't have.

THE COURT: All right."

In his brief defendant states:

"Defendant was further prejudiced by the trial judge abruptly breaking into the defense counsel's closing argument and calling a recess. This interruption came in a very crucial point in the defense's closing argument—at such the time when he was seeking to point out the numerous and material discrepancies in the testimony of the prosecutrix. This interruption reduced the effectiveness and continuity of the Defendant's assertion of innocence and lessened the Defendant's ability to completely and logically present his position. The Defendant's counsel, although an experienced trial attorney was noticeably upset and thrown off pace. * * *. Jurors are easily influenced by the remarks of a trial judge and the greatest

care should be observed that nothing is done that can by any possibility, be construed as an expression of the trial judge's views respecting the merits of a criminal case. Courts cannot be too circumspect in this regard. See Hill v. State [76 Okl.Cr. 371], 137 P.2d 261, 267.

This *unbelievable* interruption of the defense counsel's closing argument—regardless of the reason for the recess—imbued the jury with the idea that the trial judge himself felt the entire trial as a 'open and shut case' and that summation was a hollow formality, something which had to be tolerated rather than an absolute right of the Defendant and his opportunity to put his cause clearly and cogently before the jury."

■■■ Counsel for defense is undoubtedly sincere when he argues that he was thrown off pace by the interruption, but the judge carefully and meticulously advised the jury as to the reason for the recess and granted additional time to make his closing argument. The court has a duty not only to counsel, but to members of the jury, the court reporter, and indeed, to himself, to see that they are not unduly overtaxed or caused physical discomfort. When the court deems it necessary to grant a recess to prevent overtaxation and physical discomfort of the jurors, court reporter, or counsel, he has a right and a duty to declare a recess and his conduct in so doing does not imply bias or prejudice against the interrupted party.

We are of the opinion and therefore hold that this assignment of error is without merit.

Defendant further urges that reversible error was committed during the closing argument of the State. Defendant concedes that some of the closing argument now complained of, was not objected to and that his objections to other remarks were sustained by the Court and the jury admonished to disregard them. His argument, however, is substantially that whether objected to or not, the closing argument of the County Attorney was so fundamentally unfair as to require reversal.

■■■ We have carefully examined the closing argument of the State and the defendant, and in the light of the entire record we are unable to say that the closing argument of the State was so prejudicial as to require reversal or modification, nor indeed, are we of the opinion that it influenced the jury to impose a greater sentence than would ordinarily be imposed. The proof of defendant's guilt of this despicable crime, is overwhelming and unrefuted and would have supported the maximum punishment which could have been imposed by law. Here, however, it is apparent that the jury was not prejudiced against the defendant by either the pre-trial publicity or the closing argument of the County Attorney. We are unable to say whether the comparatively light sentence imposed against the accused was by reason of his youth, or the highly improper and injurious admission into evidence of statements referring to the prosecutrix as a "whore," "slut," "pig," "easy piece," etc., and moderated further by the implications to be drawn from defense witness' privilege against self-incrimination when questioned about specific acts of sexual intercourse with the prosecutrix.

There are other assignments of error which we do not deem have sufficient merit to discuss in this opinion. We are of the opinion, and therefore hold, that the judgment and sentence appealed from should be, and the same is hereby, affirmed.

## SPECIAL CONCURRING OPINION

NIX, Presiding Judge.

Though I concur in the ultimate conclusion of Judge Bussey, I feel compelled to elaborate further upon defendant's proposition number one dealing with the preliminary hearing. The Statute of the State sets forth in clear and concise language that the defendant has a right to subpoena witnesses at a preliminary hearing and examine them under oath. Title 22, O.S., § 257, which reads as follows:

"At the examination the magistrate must, in the first place, read to the defendant

the complaint on file before him. He must, also, after the commencement of the prosecution, issue subpoenaes for any witness required by the prosecutor or the *defendant."* (Emphasis ours.)

The Statute [22 O.S. § 259] further says:

"When the examination of witnesses on the part of the State is closed, any witness the defendant may produce *must* be sworn and examined." (Emphasis ours.)

I feel that the statute should be complied with, or repealed.

The Legislature does not enact statutes to be warped or twisted and interpreted to suit the converse of a particular situation.

It is well conceded that a preliminary hearing is not a trial to determine the guilt of accused, but only the two issues: "Was a crime committed, and is there reasonable cause to believe the defendant committed it?" However, this does not mean that only the state can put on witnesses and the magistrate allowed to call a halt to the proceeding under the auspices that he has been satisfied with the evidence.

Defendant certainly has a right to produce evidence material to the two issues as stated above. The materiality of evidence as to these two issues is broad in scope and the magistrate should restrict the testimony with caution, or else defendant may be denied the right of being properly confronted with his accusers. Though not so designated by law, the preliminary hearing in American Jurisprudence has been recognized as a median serving several purposes. First, it permits the state as well as the defendant to preserve the testimony of witnesses, in lieu of depositions. Witnesses die, leave the state, abscond, and are often unable to be found. Next, it is a procedure whereby defendant may discover what testimony is to be used against him at the trial, as he may examine witnesses in detail and be prepared to cope with their testimony at the time of trial.

This matter has previously been discussed in conference and it is the concensus of this Court's opinion that this decision is not to restrict the defendant in his rights under the law as it pertains to preliminary hearings, but does fortify the magistrate in his right to restrict it to those witnesses who possess information relative or material to the issues.

Therefore, the rule laid down in Parmenter v. State, Okl.Cr., 377 P.2d 842, still prevails.

BRETT, Judge (special concurring opinion).

I concur in the opinion rendered herein by Judge Bussey. However, insofar as he did not specifically mention defendant's complaint concerning the alleged violations of the district court rules, I think it should be said that this Court does not take judicial notice of the rules of the district court. Unless those rules are properly made a part of the appellate record, alleged violations of district court rules cannot constitute error on appeal. Likewise, when such rules have been made a part of the record and violations occur, proper objections should be made and exceptions taken to properly preserve the record on appeal.

Also, it is better practice, when objections are made "in chambers", to make those same specific objections in open court in order to properly preserve the record. As a general rule, what transpires in chambers is not necessarily competent to the record. When the record reflects something different to what counsel contends occurred in chambers, the Court is bound to accept what is contained in the record.

This record reflects that the trial judge conducted this trial with fairness, in an effort to scrupulously protect the defendant's rights. It is observed also, that the Judge issued sufficient orders to prevent a situation from developing similar to that described by the United States Supreme Court in Sheppherd v. Maxwell, 384 U.S. 333, 86 S.Ct. 1506, 16 L.Ed.2d 600 (1966). At the same time, those rules appeared to allow the news media sufficient leeway to report the happenings during the trial. Reasonable reporting of trial proceedings by

the news media, is one of our principle safe-guards against the recurrence of a "star-chamber proceeding". But, such reporting *must be made subject to reasonable rules of the trial court.* As the United States Supreme Court repeated in Sheppherd, supra:

> "The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."

It should be pointed out, however, that the Supreme Court stated further, while referring to the trial court in Sheppherd v. Maxwell, supra:

> "The court's [trial court] fundamental error is compounded by the holding that it lacked power to control the publicity about the trial."

We believe, however, that such power should be exercised with reason and good judgment. In the instant case, we have heard no particular complaints from the press concerning Judge Boston Smith's rules governing news media coverage of this trial.

With reference to the pre-trial newspaper statements made by the prosecution, there is no doubt in my mind whatsoever that they were improper. The trial of a criminal case should take place in the courtroom. The evidence should not be aired in the newspapers before the trial occurs.

In the instant case the evidence was sufficient; it was corroborated; and it remained unrefuted by the defendant. Consequently, such pre-trial statements appear not to have sufficiently prejudiced this defendant to cause reversible error. However, in a case wherein it is apparent that such publicity might have influenced the jury, or wherein the evidence was less sufficient than it was in the case at bar, such pre-trial newspaper statements *may well constitute reversible error.*

With further reference to the publicity mentioned above, we believe the jury was not unduly influenced thereby. In the closing arguments, the State asked the jury to impose the maximum punishment on this defendant. The jury was asked to sentence the defendant to fifteen years confinement in the state penitentiary. But instead, the jury imposed a five-year sentence upon this defendant. This fact, considered with the unrefuted evidence, contained in the record, leads the Court to conclude that the jury was not influenced by such pre-trial publicity.

Likewise, I agree completely with what Judge Nix has stated in his concurring opinion, concerning the preliminary hearing. For that reason, there is no need for me to attempt to enlarge on those comments.

After considering the voluminous record in this case, consisting of the case-made of five volumes, all the transcripts of separate hearings, numerous pleadings filed, the exhibits and briefs filed by both sides, we must conclude that this defendant received a fair trial, in accordance with due process.